Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA  90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

[additional counsel on signature page]

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAUL DURAN, Derivatively and on Behalf of PUMA BIOTECHNOLOGY, INC., | Case No.: |
| Plaintiff, | |
| vs. | |
| ALAN H. AUERBACH, CHARLES R. EYLER, THOMAS R. MALLEY, JAY M. MOYES, TROY E. WILSON, FRANK ZAVRL, and ADRIAN M. SENDEROWICZ, | |
| Defendants, | **DEMAND FOR JURY TRIAL** |
| and | |
| PUMA BIOTECHNOLOGY, INC., | |
| Nominal Defendant. | |

1
Verified Shareholder Derivative Complaint

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Paul Duran ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Puma Biotechnology, Inc. ("Puma" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Alan H. Auerbach, Charles R. Eyler, Thomas R. Malley, Jay M. Moyes, Troy E. Wilson, Frank Zavrl, and Adrian M. Senderowicz (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Puma, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.  The allegations in this Complaint are made upon Plaintiff's personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Puma, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Puma's directors and officers.  The wrongdoing described herein has taken place, at least, since February 14, 2014 and is continuing through the day of the filing of this action.  As the wrongdoing is ongoing, some of the allegations of wrongdoing described herein are still being committed, to the compounding detriment of Puma and its shareholders.

2. Puma is a biopharmaceutical company based in Los Angeles, California with a focus on the development and commercialization of products to enhance cancer care.  The Company is specifically focused on developing and commercializing

Verified Shareholder Derivative Complaint

neratinib for the treatment of patients with human epidermal growth factor receptor type 2, or HER2-positive, breast cancer, HER2 mutated non-small cell lung cancer, HER2-negative breast cancer that has a HER2 mutation and other solid tumors that have an activating mutation in HER2.

3.      Neratinib is a potent irreversible tyrosine kinase inhibitor, or TKI, that blocks signal transduction through the epidermal growth factor receptors, HER1, HER2 and HER4.

4.      Prior to the truth about the Company's misconduct emerging, Puma was actively developing only a single drug compound, PB272 ("neratinib" or "PB272"). Puma licensed the rights to develop and market neratinib from Pfizer in 2011.   Puma currently in-licenses the global development and commercialization rights to three drug candidates: PB272 (neratinib (oral)), PB272 (neratinib (intravenous)), and PB357.

5.      In the face of mounting financial pressures and a plummeting stock price, Puma's management set out on a campaign to misrepresent the success and potential of the Company and its progress in the development of neratinib.  Between July 22, 2014 and June 1, 2015, the Company touted results from its leading Phase III trial, which, if true, would have set neratinib on a path to be a market leader, generating billions in revenue on the market.   Moreover, Puma, through the Individual Defendants, represented that it would be able to market neratinib in 2015.

6.      These representations, however, were false and misleading and the Company's fraud was exposed in a very harsh and public manner.  The news caused a stock crash, and the price of the Company's stock now sits at an all-time low.

7.      The Company's public statements were materially false and misleading at all relevant times and caused an artificial inflation of Puma's stock price.

8.      In breach of their fiduciary duties owed to Puma, the Individual Defendants willfully or recklessly made and/or caused the Company to make *at least* the following false and/or misleading statements of material fact: (1) ExteNET trial data showed an absolute difference in disease-free survival rates between neratinib and placebo of approximately 5%, (2) the data from the ExteNET trial demonstrated a 33%

improvement in disease-free survival, (3) the data from the ExteNET trial showed that the Kaplan-Meier curves were separating or widening, (4) the results from the ExteNET trial were "in line" with the Herceptin Adjuvent Studies, (5) the Company anticipated filing a New Drug Application ("NDA") for neratinib in the first half of 2015, (6) that approximately 29% to 30% of patients treated with neratinib suffered grade 3 or 4 diarrhea, and that the dropout rate due to adverse events would be 5% to 10%, and (7) the Company anticipated filing an NDA for neratinib in the first quarter of 2016. These facts pertained to the Company's business, operations, and prospects and the falsity of these statements was known to the Individual Defendants or recklessly disregarded by them. The Company's statements and representations referenced above were materially false and misleading at all relevant times. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.

9. The Individual Defendants additionally breached their fiduciary duty by failing to maintain internal controls.

10. Moreover, Defendant Auerbach breached his fiduciary duties by actively seeking to have the Company acquired by a larger pharmaceutical company after Puma's stock price was artificially inflated due to the false and misleading statements.

11. The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's CEO-President-Chairman, and its top financial and accounting officer to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Fraud Class Action"), the need to undertake internal investigations, losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will cost the Company going forward many millions of dollars.

12. The Individual Defendants, who managed and controlled Puma, knowingly, recklessly, or at least with gross negligence, breached their fiduciary duties

by conspiring with one another to force the Company to issue false and misleading statements and/or omissions of material fact and to sell hundreds of millions of dollars worth of Company stock at artificially inflated prices for the purpose of increasing the Individual Defendants' salaries and stock grants.

13.     The Company's Board of Directors ("Board") has already rejected a demand for corporate reforms brought by one its large shareholders and rejected another demand by another shareholder while justifying its rejection due to relying on the investigation of partial attorneys who defended related securities fraud claims.  In the course of doing so, it engaged in an obstinate bout full of rejection, dismissal, and personal attacks.

14.     But even if a demand had not been made, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence in light of Defendants' conduct, which has subjected the Company to the Securities Fraud Class Action.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

16.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Puma.  Plaintiff has been a shareholder of Puma common stock at all relevant times, and has continuously held Puma common stock at all relevant times.  Plaintiff is a citizen of Oregon.

### Nominal Defendant Puma

22.     Puma is a Delaware corporation with its principal executive offices at 10880 Wilshire Boulevard, Suite 2150, Los Angeles, California 90024.  Puma's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PBYI."

23.     On February 16, 2016, the Individual Defendants caused Puma's certificate of incorporation to be amended with a forum selection clause requiring all shareholder derivative actions to be filed in the Court of Chancery of the State of Delaware.  The forum selection clause in Puma's amended certificate of incorporation is invalid and is not binding as to Plaintiff's claims because the amendment was made after the Individual Defendants engaged in the misconduct alleged herein.

### Defendant Auerbach

24.     Defendant Alan H. Auerbach ("Auerbach") has served as the Company's President, Chief Executive Officer ("CEO") and Chairman of the Board since October 4, 2011.  Defendant Auerbach has full control and authority, as its sole member, of the Company's Stock Option Committee, entrusted with the authority to grant stock options to non-executive employees.  For fiscal year 2014, the Stock Option Committee granted 1,980,208 stock options.  According to the Company's Schedule 14A filed with the SEC on April 30, 2014 (the "2014 Proxy Statement"), as of April 17, 2014, Defendant Auerbach beneficially owned 6,386,804 shares of the Company's common stock, which represented 19.7% of the Company's outstanding shares.  According to the Company's

Schedule 14A effectively filed with the SEC on April 30, 2015 (the "2015 Proxy Statement"), as of April 17, 2015, Defendant Auerbach beneficially owned 6,556,249 shares of the Company's common stock, which represented 18.9% of the Company's outstanding shares.  Given that, as of the close of trading on May 13, 2015, the day the fraud began to be exposed, one share of common stock traded for $209.72, Defendant Auerbach beneficially owned almost $1.4 billion worth of Company common stock.

25.   For the fiscal year ended December 31, 2013, Defendant Auerbach received $5,372,571 as compensation from the Company, which included, $60,000 as a cash bonus, $546,667 as base salary, and stock worth $4,555,285.  For the fiscal year ended December 31, 2014, Defendant Auerbach received $17,797,606 as compensation from the Company, which included, $300,000 as a cash bonus, $610,000 as base salary, and stock worth $16,876,576.  On October 7, 2015, the Compensation Committee of the Board approved an increase in Defendant Auerbach's salary from $630,000 to $693,000, effective retroactively as of September 1, 2015.

26.   The Company's 2015 Proxy Statement stated the following about Defendant Auerbach:

> *Alan H. Auerbach*. Mr. Auerbach has served as Chairman of our Board and as our President and Chief Executive Officer since October 4, 2011. Prior to October 4, 2011, he served in such capacity at Puma Biotechnology, Inc. ("Puma") , a privately-held Delaware corporation and our predecessor, from its inception in September 2010. Prior to founding Puma, Mr. Auerbach founded Cougar Biotechnology, Inc. ("Cougar") in May 2003 and served as its Chief Executive Officer, President and a member of its board of directors until July 2009, when Cougar was acquired by Johnson & Johnson. From July 2009 until January 2010, Mr. Auerbach served as the Co-Chairman of the Integration Steering Committee at Cougar (as part of Johnson & Johnson) that provided leadership and oversight for the development and global commercialization of Cougar's lead drug candidate, abiraterone acetate, for the treatment of advanced prostate cancer. Prior to founding Cougar, from June 1998 to April 2003, Mr. Auerbach was a Vice President, Senior Research

Analyst at Wells Fargo Securities, where he was responsible for research coverage of small- and middle-capitalization biotechnology companies, with a focus on companies in the field of oncology. Mr. Auerbach has served as a director of Radius Health, Inc., a public pharmaceutical company focused on acquiring and developing new therapeutics for the treatment of osteoporosis and other women's health conditions, since May 2011 and its predecessor entity from October 2010 to May 2011. Mr. Auerbach received a B.S. in Biomedical Engineering from Boston University and an M.S. in Biomedical Engineering from the University of Southern California. Mr. Auerbach was nominated to serve as a director because of his position as our President and Chief Executive Officer and his significant experience as an executive and research analyst in the biotechnology industry.

27.    Defendant Auerbach is a citizen of California.

**Defendant Eyler**

28.    Defendant Charles R. Eyler ("Eyler") has served as the Company's Senior Vice President, Finance and Administration and Treasurer since October 4, 2011. According to the 2014 Proxy Statement, as of April 17, 2014, Defendant Eyler beneficially owned 93,750 shares of the Company's common stock. According to the 2015 Proxy Statement, as of April 17, 2015, Defendant Eyler beneficially owned 123,874 shares of the Company's common stock. Given that, as of the close of trading on May 13, 2015, the day the fraud began to be exposed, one share of common stock traded for $209.72, Defendant Eyler beneficially owned just under $26 million worth of Company common stock.

29.    For the fiscal year ended December 31, 2013, Defendant Eyler received $1,283,418 as compensation from the Company, which included, $83,475 as a cash bonus, $282,900 as base salary, and stock worth $901,228. For the fiscal year ended December 31, 2014, Defendant Eyler received $4,499,559 as compensation from the Company, which included, $117,610 as a cash bonus, $304,336 as base salary, and stock worth $4,061,879. On October 8, 2015, the Compensation Committee of the Board

approved an increase in Defendant Eyler's salary, from $333,108 to $372,600, effective retroactively as of September 1, 2015.

30.     The Company's 2015 Proxy Statement stated the following about Defendant Eyler:

> *Charles R. Eyler*. Mr. Eyler has served as our Senior Vice President, Finance and Administration and Treasurer since October 4, 2011. Prior to October 4, 2011, he served in such capacity at Puma beginning on September 1, 2011. Prior to joining Puma, Mr. Eyler served as Senior Vice President of Finance at Cougar until July 2009, when Cougar was acquired by Johnson & Johnson. He also served as Treasurer of Cougar from April 2006 to July 2009. From July 2009 until March 2010, Mr. Eyler served on the Integration Steering Committee at Cougar (as part of Johnson & Johnson) and oversaw the integration of Cougar's finance and IT functions with those of Johnson & Johnson. From April 2010 until September 2011, Mr. Eyler explored various entrepreneurial and other opportunities. Prior to joining Cougar, Mr. Eyler served as Chief Financial Officer and Chief Operating Officer of Hayes Medical Inc. from March 1999 to January 2004. Mr. Eyler received his B.S. from Drexel University and his M.B.A. from Saint Francis College.

31.     Defendant Eyler is a citizen of California.

**Defendant Malley**

32.     Defendant Thomas R. Malley ("Malley") served as a director of the Company between October 4, 2011 and September 11, 2015, when he resigned. Defendant Malley served as Chairman of the Audit Committee and a member of the Compensation Committee and Nominating and Corporate Governance Committee. According to the 2014 Proxy Statement, as of April 17, 2014, Defendant Malley beneficially owned 209,326 shares of the Company's common stock. According to the 2015 Proxy Statement, as of April 17, 2015, Defendant Malley beneficially owned 228,495 shares of the Company's common stock. Given that, as of the close of trading on May 13, 2015, the day the fraud began to be exposed, one share of common stock

traded for $209.72, Defendant Malley beneficially owned just under $48 million worth of Company common stock.

33. For the fiscal year ended December 31, 2013, Defendant Malley received $694,177 in compensation from the Company. For the fiscal year ended December 31, 2014, Defendant Malley received $1,175,105 in compensation from the Company, $50,000 of which was paid in cash.

34. The Company's 2015 Proxy Statement stated the following about Defendant Malley:

> *Thomas R. Malley.* Mr. Malley has been a director since October 4, 2011. Since May 2007, Mr. Malley has served as President of Mossrock Capital, LLC, a private investment firm. From April 1991 to May 2007, Mr. Malley served with Janus Mutual Funds as an analyst for eight years and as a Vice President and Portfolio Manager for the Janus Global Life Sciences Fund for eight years. Since November 2012, Mr. Malley has served as a director of OvaScience, Inc., a life science company developing proprietary products to improve the treatment of female infertility. Since October 2006, Mr. Malley has served as a director of Synageva BioPharma Corp., a public clinical-stage biopharmaceutical company focused on the discovery, development and commercialization of therapeutic products for patients with life-threatening rare diseases and unmet medical needs. Mr. Malley previously served as a director of Cougar from 2007 to 2009. Mr. Malley received a B.S. in Biology from Stanford University in 1991. Mr. Malley was nominated to serve as a director because of his industry and investment experience.

35. Defendant Malley is a citizen of Colorado.

**Defendant Moyes**

36. Defendant Jay M. Moyes ("Moyes") has been a director of the Company since April 27, 2012. He serves as Chairman of the Compensation Committee and a member of the Audit Committee and Nominating and Corporate Governance Committee. According to the 2014 Proxy Statement, as of April 17, 2014, Defendant

Moyes beneficially owned 48,887 shares of the Company's common stock.  According to the 2015 Proxy Statement, as of April 17, 2015, Defendant Moyes beneficially owned 79,166 shares of the Company's common stock.  Given that, as of the close of trading on May 13, 2015, the day the fraud began to be exposed, one share of common stock traded for $209.72, Defendant Moyes beneficially owned over $16.6 million worth of Company common stock.

37.     For the fiscal year ended December 31, 2013, Defendant Moyes received $694,177 in compensation from the Company.  For the fiscal year ended December 31, 2014, Defendant Moyes received $1,175,105 in compensation from the Company, $50,000 of which was paid in cash.

38.     The Company's 2015 Proxy Statement stated the following about Defendant Moyes:

> *Jay M. Moyes*. Mr. Moyes has been a director since April 27, 2012. Mr. Moyes has been a member of the Board and chairman of the audit committee of Osiris Therapeutics, Inc., a publicly-held bio-surgery company, since May 2006. He has also been a member of the board of directors and the chairman of the audit committee for each of Biocardia, Inc., a privately-held cardiovascular regenerative medicine company, and Integrated Diagnostics, Inc., a privately-held molecular diagnostics company, since January 2011 and March 2011, respectively. Mr. Moyes was a member of the board of directors of Amedica Corporation, a public orthopedic implant company, from November 2012 to August 2014. He also served as Chief Financial Officer of Amedica from October 2013 to August 2014. From May 2008 through July 2009, Mr. Moyes served as the Chief Financial Officer of XDx, Inc., a privately-held molecular diagnostics company. Prior to that, Mr. Moyes served as the Chief Financial Officer of Myriad Genetics, Inc., a publicly-held healthcare diagnostics company, from June 1996 until his retirement in November 2007, and as its Vice President of Finance from July 1993 until July 2005. From 1991 to 1993, Mr. Moyes served as Vice President of Finance and Chief Financial Officer of Genmark, Inc., a privately-held genetics company. Mr. Moyes held various positions with the

accounting firm of KPMG LLP from 1979 through 1991, most recently as a Senior Manager. He holds an M.B.A. from the University of Utah, a B.A. in economics from Weber State University, and is formerly a Certified Public Accountant. Mr. Moyes also served as a member of the Board of Trustees of the Utah Life Science Association from 1999 through 2006. Mr. Moyes was nominated to serve as a director because of his extensive background in finance and accounting and his experience in the context of the life sciences industry enables him to make significant contributions to the Board.

39.     Upon information and belief, Defendant Moyes is a citizen of California.

**Defendant Wilson**

40.     Defendant Troy E. Wilson ("Wilson") has been a director of the Company since October 18, 2013. He serves as a member of the member of the Audit Committee. According to the 2014 Proxy Statement, as of April 17, 2014, Defendant Wilson beneficially owned 900 shares of the Company's issued and outstanding common stock. According to the 2015 Proxy Statement, as of April 17, 2015, Defendant Wilson beneficially owned 26,732 shares of the Company's common stock. Given that, as of the close of trading on May 13, 2015, the day the fraud began to be exposed, one share of common stock traded for $209.72, Defendant Wilson beneficially owned over $5.6 million worth of Company common stock.

41.     For the fiscal year ended December 31, 2013, Defendant Wilson received $1,934,008 in compensation from the Company. For the fiscal year ended December 31, 2014, Defendant Wilson received $1,175,105 in compensation from the Company, $50,000 of which was paid in cash.

42.     The Company's 2015 Proxy Statement stated the following about Defendant Wilson:

*Troy E. Wilson*. Dr. Wilson has been a director since October 18, 2013. Dr. Wilson has been the President and Chief Executive Officer and a member of the board of directors of Kura Oncology, Inc., a public reporting clinical stage biopharmaceutical company discovering and

12

developing personalized therapeutics for the treatment of solid tumors and blood cancers, since August 2014. He has also been the President and Chief Executive Officer and a member of the board of managers of Avidity NanoMedicines LLC, a private biopharmaceutical company, since November 2012 and the President and Chief Executive Officer and a member of the board of managers of Wellspring Biosciences LLC, a private biopharmaceutical company, since July 2012 and May 2012, respectively. Dr. Wilson served as the President and Chief Executive Officer and a member of the board of directors of Intellikine, a private biopharmaceutical company, from April 2007 to January 2012 and from August 2007 to January 2012, respectively. He has served as a director of Zosano Pharma Corporation, a public clinical stage specialty pharmaceutical company that has developed a proprietary transdermal microneedle patch system to deliver its proprietary formulations of existing drugs through the skin for the treatment of a variety of indications, since June 2014, and as a member of the board of managers of Araxes Pharma LLC, a private biopharmaceutical company, since May 2012. He holds a J.D. from New York University and graduated with a Ph.D. in bioorganic chemistry and a B.A. in biophysics from the University of California, Berkeley. Dr. Wilson was nominated to serve as a director because of his background in finance and accounting and his experience in the life sciences industry.

43.     Defendant Wilson is a citizen of California.

**Defendant Zavrl**

44.     Defendant Frank Zavrl ("Zavrl") has been a director of the Company since September 8, 2015 when he was appointed to serve on the Board in place of Defendant Malley.  Upon Defendant Zavrl's appointment to the Board, he was also appointed to the Audit Committee, on which he currently serves.   According to the 12/4/15 Presentation (defined below), Defendant Zavrl beneficially owned 913,076 shares of the Company's common stock, which represented 2.8% of the Company's outstanding shares.  Given that, as of the close of trading on September 8, 2015, the day of his

appointment, one share of common stock traded for $91.13, Defendant Zavrl beneficially owned over $83.2 million worth of Company common stock.

45.    For the fiscal year ended December 31, 2015, Defendant Zavrl was entitled to receive an annual cash retainer of $50,000.  In addition, Defendant Zavrl received an option to purchase 30,000 shares of the Company's common stock.  The option has an exercise price of $95.22 per share and will vest over a three-year period from the grant date.

46.    The Company announced Defendant Zavrl's appointments in a September 9, 2015 Form 8-K filed with the SEC and signed by Defendant Auerbach (the "9/9/15 8-K").  The 9/9/15 8-K stated the following about Defendant Zavrl:

> Mr. Zavrl served as a Partner at Adage Capital Management, L.P. from 2002 to 2011, specializing in biotechnology investments. Prior to joining Adage Capital, Mr. Zavrl was a Portfolio Manager from 1999 to 2002 at Merlin Biomed, a healthcare investment group. From 1998 to 1999, Mr. Zavrl was an analyst at Scudder Kemper Investments Inc., focusing on biotechnology investments. Mr. Zavrl received a B.S. in Biochemistry from the University of California, Berkeley and an M.B.A. from the Tuck School of Business at Dartmouth College. Mr. Zavrl was selected as a director because of his significant experience and background in the biotechnology investments field.

47.    Upon information and belief, Defendant Zavrl is a citizen of Massachusetts.

**Defendant Senderowicz**

48.    Defendant Adrian M. Senderowicz ("Senderowicz") has been a director of the Company since August 11, 2015.  He serves on the Compensation Committee. According to a Statement of Changes in Beneficial Ownership filed on Form 4 with the SEC on August 13, 2015 and signed by Defendant Senderowicz, Senderowicz beneficially owned 30,000 shares of the Company's common stock.  Given that, as of the close of trading on August 13, 2015, one share of common stock traded for $89,

Defendant Senderowicz beneficially owned almost $2.7 million worth of Company common stock.

49.    For the fiscal year ended December 31, 2015, Defendant Senderowicz was entitled to receive an annual cash retainer of $50,000.    In addition, Defendant Senderowicz received an option to purchase 30,000 shares of the Company's common stock.  The option has an exercise price of $97.01 per share and will vest over a three-year period from the grant date.

50.    The Company announced Defendant Senderowicz's appointment in an August 13, 2015 Form 8-K filed with the SEC and signed by Defendant Auerbach (amended to add information on September 9, 2015).  In that filing, the Company stated the following about Defendant Senderowicz:

> Dr. Senderowicz served as the Chief Medical Officer and Senior Vice President, Clinical Development and Regulatory Affairs from August 2014 to February 2015, and Clinical and Regulatory Strategy Officer from February 2015 to April 2015 of Ignyta, Inc., a public precision oncology biotechnology company. Prior to joining Ignyta, Dr. Senderowicz was Vice President, Global Regulatory Oncology at Sanofi, a position he held from September 2013 to August 2014. Prior to Sanofi, Dr. Senderowicz was Chief Medical Officer and Vice President, Medical Development at Tokai Pharmaceuticals, Inc. from August 2012 to March 2013. From August 2008 to March 2012, Dr. Senderowicz held positions of increasing responsibility, including Senior Medical Director, Oncology Clinical Development, at AstraZeneca. Before his tenure at AstraZeneca, Dr. Senderowicz spent almost four years in a variety of leadership positions at the U.S. Food and Drug Administration Division of Oncology Drug Products in the Center for Drug Evaluation and Research. Prior to his work with the FDA, Dr. Senderowicz held a variety of clinical and research positions, including Coordinator of the Prostate Cancer Drug Development Clinic and Investigator and Chief, Molecular Therapeutics Unit, with the National Cancer Institute/National Institutes of Health. Dr. Senderowicz holds both an M.D. and an Instructor of Pharmacology degree from

the School of Medicine at the Universidad de Buenos Aires in Argentina. Dr. Senderowicz was selected as a director because of his extensive clinical and regulatory background and his significant experience in the life sciences industry.

51.     Defendant Senderowicz is a citizen of Massachusetts.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.     By reason of their positions as officers, directors, and/or fiduciaries of Puma and because of their ability to control the business and corporate affairs of Puma, the Individual Defendants owed Puma and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Puma in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Puma and its shareholders so as to benefit all shareholders equally.

53.     Each director and officer of the Company owes to Puma and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Puma, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55.     To discharge their duties, the officers and directors of Puma were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Puma, the absence of good faith on their part, or a reckless disregard for their duties

16

to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Puma's Board at all relevant times.

57.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding neratinib's success and progress, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC and communications with shareholders, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Additionally, they had a duty not to cause the Company to waste corporate assets by selling stock at artificially inflated prices and using the badly needed proceeds for salary raises for themselves, to the detriment of the Company and its shareholders.

58.    To discharge their duties, the officers and directors of Puma were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Puma were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, the United States, the markets in which the Company operates, and pursuant to Puma's own Code of Business Conduct and Ethics and internal guidelines;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to

avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Puma conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Puma and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Puma's operations would comply with all applicable laws and Puma's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59. Each of the Individual Defendants further owed to Puma and the shareholders the duty of loyalty requiring that each favor Puma's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Puma and were at all times acting within the course and scope of such agency.

61.     Because of their advisory, executive, managerial, and directorial positions with Puma, each of the Individual Defendants had access to adverse, non-public information about the Company.

62.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Puma.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

64.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Individual Defendants received lucrative salaries, bonuses, fees, and stock.

65.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are

directors of Puma was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Puma, and was at all times acting within the course and scope of such agency.

## Code of Ethics

68. The Company's Code of Business Conduct and Ethics (the "Code of Ethics") governs the conduct of all of the Company's officers, directors, and employees and instructs their compliance with "the highest standards of business ethics," outlined in the Code of Ethics.

69. The Code of Ethics provides, as to "Reporting Violations of the Code," that:

> All employees and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company. If you know of or suspect a violation of this Code, immediately report the conduct to your supervisor or the Company's SVP, Finance. The Company's SVP, Finance, will work with you and your supervisor or other appropriate persons to investigate your concern. If you do not feel comfortable reporting the conduct to your supervisor or you do not get a satisfactory response, you may contact the Company's SVP, Finance directly. You may also report known or suspected violations of the Code on the Ethics Helpline that is available 24 hours a day, 7 days a week at 1-866-982-7272. You may remain anonymous and will not be

20

required to reveal your identity in calls to the Ethics Helpline, although providing your identity may assist the Company in investigating your concern. All reports of known or suspected violations of the law or this Code will be handled sensitively and with discretion. Your supervisor, a principal financial officer and the Company will protect your confidentiality to the extent possible, consistent with applicable laws and the Company's need to investigate your concern.

It is Company policy that any employee or director who violates this Code will be subject to appropriate discipline, which may include termination of employment or removal from the Company's board of directors (the "Board"), as appropriate. This determination will be based upon the facts and circumstances of each particular situation. If you are accused of violating this Code, you will be given an opportunity to present your version of the events at issue prior to any determination of appropriate discipline. Employees who violate the law or this Code may expose themselves to substantial civil damages, criminal fines and prison terms. The Company may also face substantial fines and penalties and may incur damage to its reputation and standing in the community. Your conduct as a representative of the Company, if it does not comply with the law or with this Code, can result in serious consequences for both you and the Company.

70.   The Code of Ethics provides, as to "Corporate Opportunities," that:

As an employee or director of the Company, you have an obligation to advance the Company's interests when the opportunity to do so arises. If you discover or are presented with a business opportunity through the use of corporate property or information or because of your position with the Company, you should first present the business opportunity to the Company before pursuing the opportunity in your individual capacity. No employee may use corporate property, information or his or her position with the Company for personal gain or should compete with the Company while employed by us.

You should disclose to your supervisor the terms and conditions of each business opportunity covered by this Code that you wish to pursue. Your supervisor will contact the Company's SVP, Finance and the appropriate management personnel to determine whether the Company wishes to pursue the business opportunity. If the Company waives its right to pursue the business opportunity, you may pursue the business opportunity on the same terms and conditions as originally proposed and consistent with the other ethical guidelines set forth in this Code.

71.   The Code of Ethics provides, as to "Competition and Fair Dealing," that:

All employees should endeavor to deal fairly with fellow employees and with the Company's customers, suppliers and competitors. Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

**Relationships with Customers**

The Company is committed to dealing with customers fairly, honestly and with integrity. Specifically, you should keep the following guidelines in mind when dealing with customers:

• Information we supply to customers should be accurate, complete to the best of our knowledge, and comply with applicable regulatory requirements. Employees should not deliberately misrepresent information to customers.

• Customer entertainment should not exceed reasonable and customary business practice. Employees should not provide entertainment and other benefits that could be viewed as an inducement to or a reward for customer purchase decisions. Please see "Gifts and Entertainment" below for additional guidelines in this area.

• Any information we receive from customers regarding patient health care should be kept confidential and protected from unauthorized access or disclosure.

**Relationships with Suppliers**

The Company deals fairly and honestly with its suppliers. This means that our relationships with suppliers are based on price, quality, service and reputation, among other factors. Employees dealing with suppliers should carefully guard their objectivity. Specifically, no employee should accept or solicit any personal benefit from a supplier or potential supplier that might compromise, or appear to compromise, his or her objective assessment of the supplier's products and prices. Employees can give or accept promotional items of nominal value or moderately scaled entertainment within the limits of responsible and customary business practice. Please see "Gifts and Entertainment" below for additional guidelines in this area.

**Relationships with Competitors**

The Company is committed to free and open competition in the marketplace. Employees should avoid actions that would be contrary to laws governing competitive practices in the marketplace, including federal and state antitrust laws. Such actions include misappropriation and/or misuse of a competitor's confidential information or making false statements about the competitor's business and business practices. For further discussion of appropriate and inappropriate business conduct with competitors, see "Compliance with Antitrust Laws" below.

72. The Code of Ethics provides, as to "Company Records," that:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our product development, clinical development, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable

in all material respects. The Company has a formal document retention policy that each employee and director must follow with respect to Company records within such employee's or director's control. Please contact your supervisor or the Company's SVP, Finance to obtain a copy of this policy or with any questions concerning the policy.

73.     The Code of Ethics provides, as to "Protection and Use of Company Assets," that:

Employees should protect the Company's assets and ensure their efficient use for legitimate business purposes only. Theft, carelessness and waste have a direct impact on the Company's profitability. The use of Company funds or assets, whether or not for personal gain, for any unlawful or improper purpose is prohibited.

To ensure the protection and proper use of the Company's assets, each employee should:

• Exercise reasonable care to prevent theft, damage or misuse of Company property;

• Report the actual or suspected theft, damage or misuse of Company property to a supervisor;

• Use the Company's telephone system, other electronic communication services, written materials and other property primarily for business-related purposes;

• Safeguard all electronic programs, data, communications and written materials from inadvertent access by others; and

• Use Company property only for legitimate business purposes, as authorized in connection with your job responsibilities.

Employees should be aware that Company property includes all data and communications transmitted or received to or by, or contained in, the Company's electronic or telephonic systems. Company property also includes all written communications. Employees and other users of this property should have no expectation of privacy with respect to these

communications and data. To the extent permitted by law, the Company has the ability, and reserves the right, to monitor all electronic and telephonic communication. These communications may also be subject to disclosure to law enforcement or government officials.

74.     The Code of Ethics provides, as to "Accuracy of Financial Reports and Other Public Communications," that:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the Company's finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

75.     The Code of Ethics provides, as to "Compliance with Laws and Regulations," that:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, approval, manufacture, marketing and sale of our products and product candidates, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course

25

of action is lawful, you should seek advice from your supervisor or the Company's SVP, Finance.

76.     The Code of Ethics provides, as to "Interactions with the Government," that:

The Company may conduct business with the federal, state and local governments and the governments of many other countries. The Company is committed to conducting its business with all governments and their representatives with the highest standards of business ethics and in compliance with all applicable laws and regulations, including the special requirements that apply to communications with governmental bodies that have regulatory authority over our products and operations, such as government contracts and government transactions. In your interactions with the government, you should:

• Be forthright and candid at all times. No employee or director should intentionally misstate or omit any material information from any written or oral communication with the government.

• Ensure that all required written submissions are made to the government and are timely, and that all written submissions, whether voluntary or required, satisfy applicable laws and regulations.

• You should not offer or exchange any gifts, gratuities or favors with, or pay for meals, entertainment, travel or other similar expenses for, government employees.

If your job responsibilities include interacting with the government, you are expected to understand and comply with the special laws, rules and regulations that apply to your job position as well as with any applicable standard operating procedures that the Company has implemented. If any doubt exists about whether a course of action is lawful, you should seek advice immediately from your supervisor and the Company's SVP, Finance.

Company employees with responsibilities in the areas governed by the FFDCA and the FDA are required to

understand and comply with these laws and regulations. These employees are expected to have a thorough understanding of the laws, regulations and other relevant standards applicable to their job positions, and to comply with those requirements. The Company has developed standard operating procedures and provides regular training to aid employees in understanding and complying with the requirements of the FFDCA and the FDA. If any doubt exists regarding whether your job position or a particular course of action is governed by these laws and regulations, you should seek advice immediately from your supervisor and the Company's SVP, Finance.

In addition to the above, you must obtain approval from the Company's SVP, Finance for any work activity that requires communication with any member or employee of a legislative body or with any government official or employee. Work activities covered by this policy include meetings with legislators or members of their staffs or with senior executive branch officials on behalf of the Company. Preparation, research and other background activities that are done in support of lobbying communication are also covered by this policy even if the communication ultimately is not made. If any doubt exists about whether a given work activity would be considered covered by this provision, you should seek advice immediately from your supervisor and the Company's SVP, Finance.

77.   The Code of Ethics provides, as to "Public Communications and Regulation FD," that:

**Public Communications Generally**

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive

27

financial data. To ensure compliance with this policy, all news media or other public requests for information regarding the Company should be directed to the Company's SVP, Finance or Senior Director, Investor Relations. In addition, you are required to read carefully and comply with our Media Relations Policies and Procedures, as amended from time to time. Please inform your supervisor or the SVP, Finance if you do not have a copy of our Media Relations Policies and Procedures.

**Compliance with Regulation FD**

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material, non-public information about the Company to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors. You are required to read carefully and comply with our Policy Statement –Guidelines for Corporate Disclosure, as amended from time to time. Please inform your supervisor or the SVP, Finance if you do not have a copy of our Policy Statement – Guidelines for Corporate Disclosure.

78.   In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting and of the Individual Defendants' schemes and caused or facilitated the schemes to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.   In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to (1) comply with the applicable laws and regulations, (2) protect corporate assets, (3) act in the Company's best interests, (4) report violations of the Code of Ethics, (5) appropriately maintain the Company's books, records, accounts, and

financial statements, (6) disseminate accurate and complete information to shareholders, the public, and government agencies, (7) engage in fair competition, and (8) make accurate filings with the SEC.

## PUMA'S CORPORATE GOVERNANCE

79. The Company's Corporate Governance Guidelines (the "Corporate Guidelines") that is available on its website, www.pumabiotechnology.com, is not up to date as of the filing of this Complaint and states, "The Board currently has four (4) members." The Company, however, increased the size of its Board from four (4) to five (5) directors on August 11, 2015. This was announced in a Form 8-K filed with the SEC on the evening of August 13, 2015 and signed by Defendant Auerbach. The lack of review associated with this outdated information is reflective of the kind of oversight that permeates the Company's Board and underscores the culpability of the Individual Defendants in the misconduct alleged herein.

80. Pursuant to the Corporate Guidelines, the entire Board is subject to the corporate governance practices contained therein.

81. The Corporate Guidelines provides, as to "The Mission of the Board of Directors," that:

> The Board of Directors (the "Board") of Puma Biotechnology, Inc. (the "Company") believes that its primary responsibility is to provide effective governance over the Company's affairs for the benefit of stockholders. The Board and its committees are responsible for determining that the Company is managed in such a way as to ensure this result. This is an active, not a passive, responsibility. The Board has the responsibility to ensure that in good times, as well as difficult ones, management is capably executing its responsibilities, and has adopted the following guidelines to assist it in the exercise of its responsibility. These guidelines are reviewed periodically and revised as appropriate to reflect the dynamic and evolving processes relating to the operation of the Board. These Corporate Governance Guidelines (these "Guidelines") are intended as a component of the flexible framework within which the Board, assisted by its committees, directs the affairs of the Company. They are

not intended to establish by their own force any legally binding obligations.

82.     The Corporate Guidelines provides, as to "Size of the Board," that: The Board currently has four (4) members. The Board believes that four members is an appropriate number based on the Company's present circumstances, but the Board will periodically evaluate in the future whether a larger slate of directors would be preferable.

83.     The Corporate Guidelines provides, as to "Membership on Other Boards," that:

A director of the Board may serve as a director of another company only to the extent such position does not conflict or interfere with such person's service as a director of the Company.  A director of the Board may not serve as a director of more than three publicly-held companies without the Board's consent.

84.     The Corporate Guidelines provides, as to "Director Responsibility," that:

The Board, as a whole, has the responsibility to ensure that in good times, as well as difficult ones, management is capably executing its responsibilities. In order for the Board to satisfy its responsibilities, each director, at a minimum, is expected to attend a significant majority of all Board meetings and to carefully review all meeting materials in advance of such meetings.

85.     The Corporate Guidelines provides, as to "Board Access to Senior Management and Independent Advisors," that:

Board members have complete access to the Company's management, subject to reasonable time constraints, in order to ensure that directors can ask any questions and receive all information necessary to perform their duties. It is assumed that Board members will use judgment to be sure that this contact is not detracting from the business operations of the Company, and that such contact, if in writing, be copied to the Chief Executive Officer. Furthermore, the Board encourages the management to bring, from time to time, managers into

> Board meetings who: (a) can provide additional insight into the items being discussed because of personal involvement in these areas, and/or (b) are managers with future potential that the senior management believes should be given exposure to the Board. Board members also shall have complete access (financial and otherwise), as necessary and appropriate, to independent advisors, but shall act as prudent purchasers of such services.

86.     The Corporate Guidelines provides, as to "Formal Evaluation of the Chairman and the Chief Executive Officer," that:

> The Chairman and Chief Executive Officer will be expected to report annually to the independent directors of the Board on his or her goals and objectives for the ensuing year, and also to report annually on the level of achievement of the preceding year's goals and objectives. All Board members shall be invited to these particular meetings, and shall have the opportunity to participate in any appropriate follow-up meetings or discussions. The Compensation Committee shall participate in the evaluation of the Chief Executive Officer and Chairman. The evaluation should be based on objective and subjective criteria including performance of the business, accomplishment of long- term strategic objectives and development of management. The evaluation will be used as a factor by the Compensation Committee when considering the compensation of the Chairman and the Chief Executive Officer.

87.     In violation of the Corporate Guidelines, the Individual Defendants who are members of the Board conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.  In violation of the Corporate Guidelines, the Individual Defendants who are members of the Board consciously disregarded their duties of loyalty, ethics, to act in the best interests of the Company,

and to use their free access to management to obtain all information necessary to fulfill their duties.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Puma's Bread and Butter, Neratinib

88.    Prior to the truth about the Company's misconduct emerging, Puma had not commercialized any product and thus, had zero revenue.  During the same period the Company only had one drug product candidate that it was actively developing, neratinib, which it licensed from Pfizer in 2011.  The license agreement with Pfizer for neratinib established a limit for the Company's expenses related to the licensor-initiated clinical trials for neratinib that were ongoing at the time of the agreement and which are referred to as the legacy clinical trials.  The license agreement was amended in July 2014 whereby the Company became solely responsible for the costs incurred or accrued in conducting the legacy clinical trials after December 31, 2013. The license amendment also adjusted the future royalty rate from a tiered royalty rate structure ranging between 10 to 20 percent to a "fixed rate in the low- to mid- teens."

89.    Neratinib is reported by the Company to be a potent irreversible tyrosine kinase inhibitor, or TKI, that blocks signal transduction through the epidermal growth factor receptors, HER1, HER2 and HER4.

90.    Breast cancer is the second leading cause of cancer deaths among women. Between 20% and 25% of breast cancer tumors show "over-expression" of the HER2 protein.  Women with these tumors are at a greater risk for disease progression and death than women whose tumors do not over-express HER2.  Most patients with HER2-positive breast cancer develop resistance to the drugs currently approved by the FDA – e.g., trastuzumab (Herceptin), pertuzumab and T-DM1 – thereby limiting treatment options.  As a result, there is a recognized need for alternative treatments to block HER2 signaling pathways.

91.    According to the Company's 2014 Form 10-K (defined below), neratinib at that time had a large potential market with approximately 36,000 patients in the United States and 34,000 patients in the European Union diagnosed with HER2-positive

breast cancer per year.  Given the size of the potential market and the drug's potential to replace FDA approved drugs on the market when a resistance develops, neratinib was expected to be a blockbuster drug if it could demonstrate a meaningful clinical benefit and ultimately be approved for use and marketing.  Defendant Auerbach, in a January 12, 2015 conference call with JP Morgan Chase analysts, touted that "neratinib will basically have the extended adjuvant setting all to itself with no competitive threats" and "[c]urrently Herceptin in year one of the adjuvant setting does approximately $4.3 billion, and all of those patients would be eligible for neratinib in year two."  As *Bloomberg* reported, at the prices Puma intended to charge, neratinib could reap $2.5 billion in annual sales by 2020.  The investment banking firm Cowen and Company also estimated that neratinib could generate total global sales for Puma of up to $6.0 billion by 2028.

## Vital Parameters for Assessing Efficacy

92.     Disease Free Survival Rate: From a clinical standpoint, one of the most important questions a physician must answer for a patient diagnosed with cancer is, what is the chance of surivival?  Thus, to determine a drug's clinical efficacy, survival statistics are essential.  Disease free survival ("DFS") is defined as the length of time after primary treatment for a cancer ends that the patient survives without recurrence or relapse, second cancer, or death.  A key metric in evaluating DFS rates across studies is the absolute benefit or absolute difference between the treatment arm and placebo arm in each study – the difference between the DFS rates for those on the drug and those on placebo.  In the relevant context, an absolute improvement in DFS of approximately 4% has the potential to be practice-changing.

93.     To further improve its chances for FDA approval and to improve its reputation in the market, Puma needed to demonstrate that the DFS rate for the patients in the neratinib group was several points higher than the DFS rate for patients in the placebo group.

94.     Kaplan-Meier Curves: The "Kaplan-Meier estimate is one of the best options to be used to measure the fraction of subjects living for a certain amount of time

after treatment. . . [and it] is the simplest way of computing . . . survival over time."[1]  In order to graph Kaplan-Meier curves, like for the DFS rate, it is necessary to have the study data concerning the number of patients in the treatment arm and the placebo arm that have and have not relapsed over pre-defined time intervals.  As the difference in DFS between the treatment and placebo arms (referred to as the "absolute difference") becomes larger over consecutive measurement periods, the Kaplan-Meier curve widens or increases.  If the opposite occurs, the Kaplan-Meier curve narrows or decreases.  Thus, generally, an increasingly efficacious drug product will produce a widening Kaplan-Meier curve, whereas a non-efficacious drug will produce a flat or narrowing Kaplan-Meier curve.

### Important Clinical Trials Relating to HER2-positive Breast Cancer

95.    Herceptin is approved by the FDA for the treatment of HER2-positive breast cancer.  The primary trial that determined one year of Herceptin improved outcomes compared to no Herceptin is the Herceptin® Adjuvant (HERA) trial.  This trial showed a statistically significant improvement of DFS and overall survival.  DFS at 3 years was 85·7% *vs.* 79·4% in the placebo group (p<0·0001).

96.    Puma's ExteNET trial ("ExteNET") was a discontinued Pfizer legacy trial whose enrollment was halted at approximately 2,800 patients in October 2011.  ExteNET's results, however, were touted once they were released in 2014.  ExteNET was a double-blind, placebo-controlled, Phase III trial of neratinib versus placebo after adjuvant treatment with Herceptin in women with early stage HER2-positive breast cancer.  More specifically, the ExteNET trial enrolled 2,840 patients in 41 countries with early stage HER2-positive breast cancer who had undergone surgery and adjuvant treatment with trastuzumab.  After completion of adjuvant treatment with trastuzumab,

---

[1] Goel et al., "Understanding survival analysis: Kaplan-Meier estimate," Int J Ayurveda Res. 2010 Oct-Dec; 1(4): 274–278, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3059453/ (last accessed April 10, 2016).

patients were randomized to receive extended adjuvant treatment with either neratinib or placebo for a period of one year.  Patients were then followed for recurrent disease, ductal carcinoma in situ (DCIS), or death for a period of two years after randomization in the trial.

97.    As an inclusion criteria for ExteNET, patients needed to have tumors that were HER2 positive using local assessment.  In addition, as a pre-defined subgroup in the trial, patients had centralized HER2 testing performed on their tumor as well.  The primary endpoint of the trial, according to the 2014 10-K (defined below), was disease free survival (DFS).[2]  The secondary endpoint of the trial was disease-free survival including ductal carcinoma in situ (DFS-DCIS).

**Adverse Events: Grade 3 or 4 Diarrhea**

98.    The analysis of safety in clinical trial is generally performed by reporting and tracking incidences of adverse events of interest.  An adverse event is any unfavorable change in health that occurs in trial participants during the clinical trial or within a specified period following the clinical trial.  Such events are generally characterized as "other adverse events" or as "serious adverse events."  Diarrhea adverse events are measured on a scale from grade 1—minor change in bowel movement—to grade 5—death.  Grade 3 diarrhea is present when a patient suffers from an increase of greater than seven bowel movements a day over baseline and/or hospitalization as a result of diarrhea.  Grade 4 diarrhea is present when a patient faces life-threatening consequences, which include extremely low blood pressure as a result of severe dehydration.

---

[2] Notably, after shareholder allegations relating to false and misleading statements of material fact were made against the Company, the Company shifted its description of ExteNET, including changing the primary endpoint to "***invasive*** disease free survival."

99.    To further improve its chances for FDA approval and to improve its reputation in the market, Puma needed to demonstrate that neratinib did not have severe side effects seriously outweighing the benefits of taking it.

**February 2014 – Badly in Need of Cash, Puma Conducts a Public Offering**

100.    On March 3, 2014, the Company filed its annual report for the fiscal year ended December 31, 2013 with the SEC, signed by Defendants Auerbach, Malley, Moyes, Wilson, (i.e., the entire Board at the time), and Defendant Eyler (the "2013 10-K").

101.    Attached to the 2013 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Auerbach and Eyler attesting to the accuracy of the 2013 10-K.

102.    In the 2013 10-K, the Company reported an annual operating loss of $54.8 million, loss per share of $1.90, and influx of only $2.2 million in cash through financing activities.

103.    The 2013 10-K explained that the Company expected heavy expenses moving forward, stating that:

> We have incurred negative cash flows from operations since we started our business. We have spent, and expect to continue to spend, substantial amounts in connection with implementing our business strategy, including our planned product development efforts, our clinical trials, and our R&D efforts. Given the current and desired pace of clinical development of our three product candidates, over the next 12 months we estimate that our R&D spending will be approximately $50 million to $60 million, excluding stock-based compensation. We will need approximately $7 million to $8 million for general and administrative expenses over the next 12 months, excluding stock-based compensation. The actual amount of funds we will need to operate is subject to many factors, some of which are beyond our control.

104.   The 2013 10-K also explained the Company's position of not being able to continue its business if adequate financing was not available.  Specifically, the 2013 10-K stated:

> If we do not succeed in timely raising additional funds on acceptable terms, we may be unable to complete planned pre-clinical and clinical trials or obtain approval of any drug candidates from the FDA and other regulatory authorities. In addition, we could be forced to discontinue product development and forego attractive business opportunities. Any additional sources of financing will likely involve the issuance of additional equity securities, which will have a dilutive effect on our stockholders.

105.   It was under these economic pressures that the Company initiated a public offering of its common stock in February of 2014.  According to the 2013 10-K, on February 14, 2014, the Company completed a public offering, in which it sold 1,126,530 shares of its common stock and received net proceeds of approximately $129.3 million after expenses.

**The Individual Defendants Had Access to, and Knowledge of, Material Nonpublic Facts Regarding ExteNET Trial Results**

106.   Alvin Wong ("Wong"), the Company's Senior Director of Clinical Science, emailed Defendant Auerbach and Puma executives a document on July 17, 2014 tiled "Neratinib Protocol 3144A2-3004-WW Top-Line Efficacy Analysis Part A (2 years + 28 days)" (the "Efficacy Analysis").  The Efficacy Analysis noted that: (a) the Kaplan-Meier curves were essentially flat with no trend of separation between the treatment and placebo arms from one year after randomization to two years after randomization and were narrowing at the end of the two-year period; and (b) the DFS rates for the primary endpoint in the ExteNet trial were 93.9% in the treatment arm and 91.6% in the placebo arm for an absolute difference of 2.3%.  Wong emailed Defendant Auerbach and other Company executives a PowerPoint presentation the next day on July 18, 2014 titled "3004 Executive Summary of Safety 18JUL2014" and ExteNET top-line safety tables, which noted that: (a) the discontinuation rate for neratinib patients

Verified Shareholder Derivative Complaint

due to grade 3 or 4 diarrhea was 16.8% and the overall dropout rate for neratinib patients due to adverse events was 27.6%; and (b) 39.9% of patients in the treatment arm experienced grade 3 or 4 diarrhea.

**July 22, 2014 – The Scheme Begins**

107.   The money raised by the Company in its February 2014 public offering was certainly not going to be enough moving forward and the Company knew it.  In the first six months of 2014 alone, the Company spent almost $60 million on operations. To make matters worse for Puma, an amendment to the Company's license agreement with Pfizer that was entered into in July 2014, made the Company solely responsible for the costs incurred or accrued in conducting the legacy clinical trials after December 31, 2013, costing approximately $30 million, most of which was due in 2014. Something had to be done to save the stock from crashing, and management had the solution: embellish the results of ExteNET, a "[d]iscontinued Pfizer Legacy Stud[y]."

108.   On July 22, 2014, the Company filed a Form 8-K with the SEC, signed by Defendant Auerbach, which attached a press release issued earlier that same day (the "7/22/14 Press Release").  The 7/22/14 Press Release was titled, "Puma Biotechnology Announces Positive Top-line Results from Phase III PB272 Trial in Adjuvant Breast Cancer (ExteNET Trial): Neratinib Achieves Statistically Significant Improvement in Disease Free Survival Company Plans to File for Regulatory Approval in First Half of 2015."

109.   The 7/22/14 Press Release represented that "[t]he results of [the ExteNET trial] demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival versus placebo."

110.   Moreover, the 7/22/14 Press Release represented that the Company was going to file a NDA with the FDA in the first half of 2015.  The 7/22/14 Press Release stated, "[b]ased on these results from the ExteNET study, Puma plans to file for regulatory approval of neratinib in the extended adjuvant setting in the first half of 2015."

111.   Defendant Auerbach was quoted in the 7/22/14 Press Release stating that the Company was "pleased with the results of the ExteNET trial with neratinib," and that the trial showed unprecedented success that "provides a meaningful point of differentiation for neratinib in the treatment of HER2 positive breast cancer."

112.   The 7/22/14 Press Release announced that a conference call would take place later that day to further discuss the announcements mentioned therein (the "7/22/14 Conference Call").

113.   During the 7/22/14 Conference Call, Defendant Auerbach engaged in the following exchange with Yaron Werber, a Citi Research analyst, which touched upon the DFS of the control arm and diarrhea and dropout rates in the ExteNET trial:

> [WERBER:] Congrats on this fantastically and, in many ways, unexpected data. So I have a ton of questions. Maybe I'll just take two, if you don't mind. One is, give us a little bit of a sense, what was the DFS on the control arm, first. And then second, help us understand, what do you know about the safety profile?

> [AUERBACH:] Okay. So in terms of the DFS of the placebo arm of the trial, it was in line with other reported trials. So it's inline with the Herceptin adjuvant studies. And then in terms of the safety profile, we haven't yet fully validated the safety database.  Our anticipation is the main AE we're going to see is what we've historically seen with neratinib, which is the diarrhea.  And again, we would anticipate that the diarrhea rate, the grade 3 diarrhea rate, would be in line with the 29% to 30% that's been seen in the prior studies of neratinib as a monotherapy.

> * * *

> [WERBER:] You're thinking that, if I'm correct, the DFS is probably around mid to high 80s, around 86% or so in the control arm?

> [AUERBACH:] I would be comfortable with that number.

> [WERBER:] And one would imagine you probably had to show around 90% or 91% [in the treatment arm]? Is that

reasonable?

[AUERBACH:] Yes. I think you can do a 33% improvement
in DFS and come up with that calculation, given the numbers
we gave.

114.   Thus, Defendant Auerbach represented that the DFS of the control arm (i.e.
placebo) was "in line" with the Herceptin Adjuvant Studies at roughly 86%.  Given
Defendant Auerbach's response that a 33% improvement over 86% is the right
calculation, he represented that the treatment arm demonstrated a DFS of 90%-91%, or
in other words an absolute DFS benefit of approximately 5%.

115.   During the 7/22/14 Conference Call, Defendant Auerbach also engaged in
the following exchange with Leerink Partners analyst, Howard Liang, regarding the
Kaplan-Meier curves for ExteNET:

[LIANG:] Congratulations, Alan, and your team. So can you
– I assume you have seen the curves for the two arms. Can
you give us a sense as to whether the separation is widening
over time? Or how would you describe the curve separation?

[AUERBACH:] Yes, Thanks for that question, Howard.
Okay, so [ExteNET] started in April of 2009, and this data cut
is as of October 2013. So that's essentially the last patient was
followed for 2 years. So from those numbers, you can see we
have a lot of patients who have been in for much more than
that 2-year cutoff. If we look at the curves going out beyond
that, it looks like the curves are continuing to separate.

And to give a little more detail on that, if you look at the
curves in the Herceptin adjuvant trials – so the HERA study,
the BCIRG study, et cetera – the absolute difference in
disease-free survival increases as you go out year over year.
So, for instance, in the BCIRG trial, the DFS difference was
6% at 2 years and 7% at 3 years, then 8% at 4 years . . . .

We're seeing the same preliminary trend in the ExteNET trial,
where the curves appear to be continuing to separate as you
go out year over year, and the absolute DFS difference is
increasing year over year as well.

116.   During the 7/22/14 Conference Call, Defendant Auerbach also provided the Company's expectations for grade 3 diarrhea rates in the ExteNET trial and falsely noted that the Company "has not yet seen the safety results from the ExteNET trial for neratinib," stating, in relevant part:

> [AUERBACH:] From a safety perspective, the Company has not yet seen the safety results from the ExteNET trial for neratinib, as the data is still being validated.

> * * *

> Prior to Puma licensing the drug, neratinib monotherapy was previously tested in two Phase II trials in patients with HER2-positive metastatic breast cancer, the results of which were published in European Journal of Cancer in December 2013 and the Journal of Clinical Oncology in 2010. In those studies, grade 3 or higher diarrhea was seen in 29% and 30% of the patients, respectively.

> The ExteNET trial was started in April of 2009, prior to Puma licensing the drug in 2011. Neratinib was given as a monotherapy, and no prophylaxis to prevent neratinib-related diarrhea was used. Therefore, the Company anticipates that the grade 3 diarrhea rates in the ExteNET trial are likely to be in line with what was previously published in the prior Phase II trials that were published in the European Journal of Cancer and the Journal of Clinical Oncology.

117.   Defendant Auerbach also engaged in the following exchanges during the 7/22/14 Conference Call with Eric Schmidt of Cowen and Co. and Matt Roden of UBS Securities, respectively, concerning diarrhea and dropout rates in the ExteNET trial:

> [SCHMIDT:] Thanks. And lastly, I think you probably do know the dropout rate from the trial. Could you remind us of that?

> [AUERBACH:] Dropout rates due to side effects?

> [SCHMIDT:] Sure, or anything, if you have it.

[AUERBACH:] I don't have that. I apologize. That's part of the stuff being validated, but we anticipate, typically in the neratinib studies – the legacy ones that were done before, when Pfizer was running it without any prophylaxis – it was usually in the 5% to 10% range was the dropout rate due to AEs. So we'd anticipate it's in that same vein.

* * *

[RODEN:] I just wanted to clarify an earlier answer to a question. So you were asked about the dropout rate, and I think you wanted to defer to dropouts due to – discontinuations due to adverse events. But can you just mention, or maybe I missed it, how many patients actually completed the year of therapy? Or another way of saying it is how much missing data is there from the DFS analysis?

[AUERBACH:] Yes, so in terms of patients who dropped out due to AEs, like I said, historically with neratinib, that should be somewhere in the 5% to 10% range.

[RODEN:] Okay, but do you have a sense for dropouts for any reason across the study?

[AUERBACH:] No, the main one we would expect is due to AEs. And obviously, if they progressed or died.

118.   Following the 7/22/14 Conference Call, a pharmaceutical analyst at UBS Securities explained that "commentary on the call adds to our confidence: the DFS curves apparently widen over time, and neratinib appears active in all subgroups examined, suggesting broad utilization."

119.   On this news, Puma's stock price soared, increasing $174.37 per share by the close of the market on July 23, 2014, a single-day increase of over 295%.

120.   The Company's representations garnered massive national media attention.  On July 22, 2014, an article was published on the website, FierceBiotech: The Biotech Industry's Daily Monitor, titled "Puma shares triple on positive PhIII

neratinib data, plans to file for approval."[3]  The article drew a direct causal connection between the stock price surge and the Company's reported Phase III results. Specifically, the article stated the following:

> Shares of Puma Biotechnology ($PBYI) soared more than 220% after the markets closed on Tuesday as investors cheered the biotech's positive Phase III numbers for a late-stage study of their lead drug neratinib (PB272). . . . And the company says it will now start prepping for a regulatory filing on the drug, now expected in the first half of 2015. . . .

> Investigators for the biotech say they tracked a 33% improvement over placebo in disease-free survival. . . . Investors went crazy for the results, tripling the price of the stock in a matter of minutes.

121.   On July 23, 2014, while the stock was skyrocketing, host of CNBC's Mad Money, former hedge fund manager, and best-selling author Jim Cramer reflected on the gravity and market reaction to the Company's news.[4]  Specifically, Jim Cramer stated the following:

> It's Puma Biotech, probably most people haven't heard about it, the stock was down very badly going into yesterday when they revealed the results [of ExteNET], 33% disease free survivors breast cancer, this is that early stage breast cancer, H-E-R, HER2. This is a remarkable number. . . . So you're going to see the stock quadruple because this is a remarkable number."

---

[3] John Carroll, "Puma shares triple on positive PhIII neratinib data, plans to file for approval" (July 22, 2014), http://www.fiercebiotech.com/story/puma-shares-triple-positive-phiii-neratinib-data-plans-file-approval/2014-07-22 (last accessed April 7, 2016).

[4] *See* Cramer's Mad Dash: PBYI could quadruple, seekingalpha.com/symbol/PBYI/videos/1839995 (July 23, 2014) (last accessed April 7, 2016).

122.   Also on July 23, 2014, an article was published on the popular financial investment website, MarketWatch, titled "Puma Biotech's blast-off is not a typical short squeeze."  The article reported that the Company's stock "soared $170.83, or 289%, to $229.86 in midday trading [on July 23, 2014] . . . . The blast-off follows the company's announcement late Tuesday of positive results from a Phase 3 trial of its breast cancer treatment."[5]

**August 11, 2014 – Second Quarter 2014 Results**

123.   On August 11, 2014, the Company filed a quarterly report for the period ended June 30, 2014 on a Form 10-Q with the SEC ("2Q 2014 10-Q"), which was signed by Defendants Auerbach and Eyler.

124.   Attached to the 2Q 2014 10-Q were SOX certifications signed by Defendants Auerbach and Eyler attesting to the accuracy of the 2Q 2014 10-Q.

125.   The 2Q 2014 10-Q, aside from revealing the dire financial condition of the Company before the July 22, 2014 misrepresentations, continued to lead investors to believe that the Company was going to file an NDA with the FDA in 2015.  To that end, the Company repeatedly made statements relating to its preparations for a 2015 NDA filing and expected approval in the same year.

126.   For example, the Company represented in its 2Q 2014 10-Q, "We expect R&D expenses to continue to increase as we recognize the additional expenses associated with the legacy clinical trials and as we to (sic) hire additional R&D employees during the remainder of 2014 to support the filing of a New Drug Application, or NDA, with the FDA during 2015."

127.   Moreover, the Company, in its 2Q 2014 10-Q, represented that "we do not expect to receive approval of a product candidate until approximately 2015."  This led

_____

[5] Tomi Kilgore, "Puma Biotech's blast-off is not a typical short squeeze" (July 23, 2014), http://www.marketwatch.com/story/pumas-blast-off-is-not-a-typical-short-squeeze-2014-07-23 (last accessed April 7, 2016).

investors and the public to believe that the Company expected to receive approval of their only actively developed drug product candidate, neratinib, in 2015.

**August 21, 2014 – Investors' Impressions from Puma's Data Representations**

128.   On August 21, 2014, an article published on Seeking Alpha, a platform for investment research, with broad coverage of stocks, asset classes, ETFs and investment strategy whose website, seekingalpha.com, serves as an important resource to many in the financial industry and is relied on for its breaking news, stated "**Bottom line: The results from the ExteNET trial, which announced a 33% improvement, is disease free survival, translate into a disease free survival of about 90% vs. about 85% percent with herceptin alone.**"[6]  (Emphasis in original).

**November 13, 2014 – Conference Call on Phase II Trial Reiterates Misrepresentations**

129.   On November 13, 2014, the Company issued a press release announcing results from a Phase II clinical trial of neratinib for the treatment of first-line HER2-positive locally recurrent or metastatic breast cancer (NEfERTT trial) and scheduling a conference call that was held later that same day to discuss the NEfERTT trial results.

130.   During that conference call, Defendant Auerbach spoke about ExteNET and reiterated that "[t]he primary endpoint of this trial was disease-free survival and neratinib demonstrated a 33% improvement in disease-free survival."

**December 2, 2014 – Another Misleading Call with Investors**

131.   On December 2, 2014, the Company filed a Form 8-K with the SEC, signed by Defendant Auerbach, which attached a press release issued earlier that same day (the "12/2/14 Press Release").  The 12/2/14 Press Release was titled, "Puma Biotechnology Updates Timeline for Filing New Drug Application" and contained the headline, "*NDA Filing Currently Anticipated for Q1 2016*."  (Emphasis in original).

─────────────────

[6] Sam Ross, "Puma Biotechnology: Who Are They? What Happened? And, Where Are They Going?" (August 21, 2014), http://seekingalpha.com/article/2442635-puma-biotechnology-who-are-they-what-happened-and-where-are-they-going (last accessed April 10, 2016).

132.   In the 12/2/14 Press Release, the Company acknowledged its past representations regarding filing the NDA for neratinib in the first half of 2015, but said that, based on the Company's recent meetings with the FDA, "Puma intends to delay its proposed timeline for filing the NDA until the first quarter of 2016."

133.   Later the same day, December 2, 2014, the Company held a conference call to discuss its shocking news about the delay in its NDA filing.

134.   During the conference call, Defendant Auerbach confirmed that the FDA had requested Puma to submit the results of the two-year DFS data from ExteNET and again acknowledged that the Company maintained and had direct knowledge of the DFS rates for the treatment and placebo arms.  Specifically, Defendant Auerbach stated, "That's correct. The data that was provided [to the FDA] was the full DFS data – so the Kaplan-Meier curves, [all the] endpoints, the DFS rates, the whole nine yards."

**December 4, 2014 – SEC Reprimand**

135.   On December 4, 2014, the SEC sent a letter to Defendant Eyler taking issue with the Management's Report on Internal Control over Financial Reporting included in the 2013 10-K.  The SEC felt it necessary to remind the Company's management that it was responsible for the accuracy and adequacy of the Company's filings.  Specifically, the SEC stated the following:

> We urge all persons who are responsible for the accuracy and adequacy of the disclosure in the filing to be certain that the filing includes the information the Securities Exchange Act of 1934 and all applicable Exchange Act rules require. Since the company and its management are in possession of all facts relating to a company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made.

136.   The SEC required the Company to provide a written statement acknowledging that (1) the company is responsible for the adequacy and accuracy of the disclosure in the filing, (2) staff comments or changes to disclosure in response to staff comments do not foreclose the Commission from taking any action with respect to the filing, and (3) the company may not assert staff comments as a defense in any

proceeding initiated by the Commission or any person under the federal securities laws of the United States.

137.   On December 18, 2014, Defendant Auerbach, writing on behalf of the Company, responded to the SEC with amended financials and assured the SEC that the Company applied the appropriate standard for management's assessments on the Company's Internal Control Over Financial Reporting.   Also, the Company acknowledged that it was responsible for the adequacy and accuracy of the disclosure in the filing.

138.   On January 2, 2015, the SEC wrote again to the Company, this time issuing a stern warning for the future.  The SEC wrote:

> We remind you that [y]our comments or changes to disclosure in response to our comments do not foreclose the Commission from taking any action with respect to the company or the filings and the company may not assert staff comments as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States. ***We urge all persons who are responsible for the accuracy and adequacy of the disclosure in the filings to be certain that the filings include the information the Securities Exchange Act of 1934 and all applicable rules require***.[7]

### January 20-22, 2015 – Follow-on Offering

139.   Feeling the heat from the SEC and that its scheme to defraud the public was coming loose, the Company sought to immediately capitalize off of the artificially inflated stock price by holding yet another public offering.

140.   On January 20, 2015, the Company filed a Registration Statement on Form S-3ASR with the SEC, signed by Defendants Auerbach, Malley, Moyes, Wilson, (i.e. the entire Board at the time), and Eyler, in connection with an offering of 1,000,000 shares of Puma common stock, in addition to debt securities and warrants (the "2015 Registration Statement").

---

[7] Unless otherwise noted, emphasis added throughout.

141.   The 2015 Registration Statement explained that the Company was spending money at an unprecedented rate; it incurred a net loss of $94.5 million in the nine months ended September 30, 2014, more than the total net loss of three out of the four previous fiscal years combined.

142.   The 2015 Registration Statement incorporated by reference the Company's 7/22/14 Press Release announcing the purported results of ExteNET.

143.   On January 20, 2015, the Company filed a prospectus, undated, on Form 424B5 (the "2015 B5 Prospectus") to announce the offering of 1 million shares of Puma common stock (the "2015 Follow-on Offering").   Defendants Auerbach and Eyler wrote, adopted and approved of the contents of the 2015 B5 Prospectus.

144.   The 2015 B5 Prospectus made similar misrepresentations as those made in the 7/22/14 Press Release regarding the results from ExteNET.  The 2015 B5 Prospectus represented "The results of [the ExteNET trial] demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival versus placebo."

145.   The 2015 B5 Prospectus reiterated that the Company "anticipate[s] presenting and publishing the Phase III trial results in mid-2015 and intend[s] to file for regulatory approval of neratinib in the extended adjuvant setting in the first quarter of 2016."

146.   Moreover, the 2015 B5 Prospectus represented to investors and the public that the market for neratinib, once approved, will be lucrative.  The Company stated, "We believe that the worldwide Herceptin adjuvant revenue in 2013 was approximately $4.3 billion."

147.   On January 22, 2015, the Company filed a prospectus, dated January 21, 2015, on Form 424B2 (the "2015 B2 Prospectus") also announcing the 2015 Follow-on Offering.  Defendants Auerbach and Eyler wrote, adopted and approved of the contents of the 2015 B2 Prospectus.

148.   The 2015 B2 Prospectus contained the identical misrepresentations contained in the 2015 B5 Prospectus.

149.   On January 21, 2015, the Company entered into an agreement with two of its underwriters that allowed them to purchase up to an additional 150,000 shares of its common stock at the public offering price, less underwriting discounts and commissions.

150.   By January 27, 2015, the Company completed the 2015 Follow-on Offering.  In total, the Company sold 1,150,000 shares of Company common stock in the 2015 Follow-on Offering, which netted proceeds of $205 million for the Company after expenses.

**February 12, 2015 – Another Misleading Conference Call**

151.   On February 12, 2015, Puma held a conference call with analysts and investors for the purpose of updating the market regarding the Company's product pipeline.  Defendant Auerbach led the call and again claimed that the results of ExteNET demonstrated that "[t]here was a 33% improvement in disease-free survival" for patients on neratinib.

**March 2, 2015 - 2014 Annual Report**

152.   On March 2, 2015, the Company filed an annual report for the fiscal year ended December 31, 2014 on a Form 10-K with the SEC ("2014 10-K"), which was signed by Defendants Auerbach, Malley, Moyes, Wilson, (i.e. the entire Board at the time), and Defendant Eyler.

153.   Attached to the 2014 10-K were SOX certifications signed by Defendants Auerbach and Eyler attesting to the accuracy of the 2014 10-K.  Specifically, the SOX certifications certified that the 2014 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

154.   <u>Financials</u>: For the year ended December 31, 2014 ("Fiscal 2014") the Company reported operating losses of $142.3 million, which resulted in a net loss per common share of $4.73 with 30,010,979 common shares outstanding.  This included $122.9 million spent on research and development in Fiscal 2014.  The Company's general and administrative ("G&A") expenses increased 97.8% from the previous fiscal

49

year. The Company admitted that its almost doubling of G&A expenses was "primarily attributable to an increase in stock-based compensation expense . . . payroll . . . [and] professional fees." On the recent infusion of cash from the sale of Company stock in the Follow-on Offering, the 2014 10-K reported total Company assets of $162.8 million.

155.    Clinical Results: Regarding the results of ExteNET, the Company stated, "The primary endpoint of the trial was disease free survival (DFS). The results of the trial demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival versus placebo." Moreover, the Company stated, "[w]e anticipate presenting and publishing the Phase III trial results in mid-2015 and intend to file for regulatory approval of neratinib in the extended adjuvant setting in the first quarter of 2016."

**March 3, 2015 and May 7, 2015 – Clinical Update Conference Calls**

156.    On March 3, 2015, Puma held a conference call with investors and analysts to provide an update on the status and results of the Company's clinical trial programs. During the call, Defendant Auerbach stated, "So we announced the results in July of 2014, where we announced that the trial hit the primary endpoint. So, 33% improvement in disease free survival . . . ."

157.    On May 7, 2015, Puma held a conference call with investors and analysts to provide an update on the regulatory and clinical status of neratinib. During the call, Defendant Auerbach reiterated: "In July last year, we announced the trial hit its primary endpoint. We saw a 33% improvement in invasive disease-free survival . . . ."

**May 11, 2015 – First Quarter 2015 Results**

158.    On May 11, 2014, the Company filed a quarterly report for the period ended March 31, 2015 on a Form 10-Q with the SEC ("1Q 2015 10-Q"), which was signed by Defendants Auerbach and Eyler.

159.    Attached to the 1Q 2015 10-Q were SOX certifications signed by Defendants Auerbach and Eyler attesting to the accuracy of the 1Q 2015 10-Q.

160.    The 1Q 2015 10-Q stated the following about the Company's slated NDA submission to the FDA:

[W]e expect payroll and related costs and professional fees and expenses to continue to increase as we prepare to support the Company's activities related to the filing of a New Drug Application, or NDA, with the FDA during the first quarter of 2016 and as we prepare for commercialization.

\*\*\*

The remaining approximately $33.6 million of cash used in operating activities reflects the increased cost associated with expanding our clinical trials and in preparing for the filing of an NDA in the first quarter of 2016.

### The Truth Begins to Emerge: May 13, 2015

161.   After the close of trading on May 13, 2015, Puma released four abstracts relating to neratinib ahead of their presentation at the American Society of Clinical Oncology ("ASCO") annual meeting.  Among these abstracts was Abstract #508, which reported results for ExteNET.[8]

162.   Abstract #508 reported that "93.9 percent of neratinib patients were alive without their disease progressing, compared with 91.6 percent of patients with a placebo," and "Puma had previously disclosed that treatment with neratinib had resulted in a significant 33 percent improvement in disease-free survival."

163.   Abstract #508's data showed that the DFS (listed as "IDFS") for patients in the treatment arm of ExteNET was 93.9% and the DFS for patients in the placebo arm was 91.6%.  Thus, according to Abstract #508, the absolute difference in DFS rates between neratinib and placebo was only 2.3%, which was considerably, and materially, lower than what was reported by the Company.

---

[8] Arlene Chan et al., *Neratinib after adjuvant chemotherapy and trastuzumab in HER2-positive early breast cancer: Primary analysis at 2 years of a phase 3, randomized, placebo-controlled trial (ExteNET)*, J Clin Oncol 33, 2015 (suppl; abstr 508); *see* http://meetinglibrary.asco.org/content/149972-156 (last accessed April 9, 2016); http://meeting.ascopubs.org/cgi/content/abstract/33/15_suppl/508?sid=fb118108-f0b2-45d1-b3b8-e9ae7c175986 (last accessed April 9, 2016).

164.   The news garnered national attention.  For example, an article published by Seeking Alpha on May 13, 2015 stated the following about the news:

> Puma Biotechnology (NYSE:PBYI) has tumbled to $165.00 in AH trading after releasing 4 abstracts for its PB272 (neratinib) breast cancer drug that will be presented at the ASCO annual meeting (runs from May 29-June 2).
>
> The abstracts are available on ASCO's site. Puma initiated a Phase 2 study for neratinib in March.[9]

165.   Likewise, an article published by Reuters on May 13, 2015 stated the following about the news:

> Puma shares slid 25 percent after hours following release of the findings on Wednesday by the American Society of Clinical Oncology ahead of its annual meeting later this month.
>
> \*\*\*
>
> It found that after two years, 93.9 percent of neratinib patients were alive without their disease progressing, compared with 91.6 percent of patients treated with a placebo.
>
> Puma had previously disclosed that treatment with neratinib had resulted in a significant 33 percent improvement in disease-free survival.[10]

166.   The next day, May 14, 2015, an article was published by FierceBiotech titled "The ASCO roundup: Thumbs down for Puma, up for Roche, mixed for Bristol-Myers."[11]  The article labeled Puma a "big loser" and, referring to the data presented in

---

[9] Eric Jhonsa, "Puma down 21.3% after releasing neratinib abstracts" (May 13, 2015), http://seekingalpha.com/news/2521996-puma-down-21_3-percent-after-releasing-neratinib-abstracts (last accessed April 10, 2016).

[10] Deena Beasley, *Puma Biotech breast cancer trail detailed, shares fall 25 pct* (May 13, 2015), http://www.reuters.com/article/cancer-asco-puma-idUSL1N0Y430E20150513 (last accessed April 10, 2015).

[11] John Carroll, *The ASCO roundup: Thumbs down for Puma, up for Roche, mixed for Bristol-Myers* (May 14, 2015), http://www.fiercebiotech.com/story/asco-roundup-

Abstract #508, the article stated, "Scoring the percentage of women who were free of invasive disease, the neratinib group hit 93.9% compared to 91.6% in the placebo arm. Analysts did a double take on the meager 2.3% difference and quickly turned thumbs down on the data. . . ."

167.   On this news, the price of Puma's common stock plummeted by $39.05 per share or 18.6% to close at $170.67 on May 14, 2015.  The huge drop came on massive volume, as the number of shares traded on May 14, 2015 increased more than nine-fold over Puma's average daily trading volume for the prior 90 days.

**May 28, 2015 – Restricting Access at ASCO**

168.   On May 28, 2015, an article was published on TheStreet, an investment analysis resource, titled "Puma Bio Restricting Access to Breast Cancer Event at ASCO Chicago" (the "TheStreet Report").[12]   TheStreet Report explained, "Puma Bio, embroiled in controversy over its breast cancer drug neratinib, is turning away some investors and at least one analyst from [the ASCO annual meeting]."

169.   Importantly, TheStreet Report called the Company out on its shady practices, stating, "Restricting access to a corporate event might not be such a big deal if not for Puma's penchant for selectively disclosing important information to people deemed friendly to the company."

170.   TheStreet Report noted that Abstract #508 contained "disappointing results from a large study of neratinib in breast cancer patients."  It then noted that additional data not published in the abstract was selectively released to certain institutional investors, but not others.

_____

thumbs-down-puma-roche-mixed-bristol-myers/2015-05-14 (last accessed April 10, 2016).

[12] Adam Feuerstein, "Puma Bio Restricting Access to Breast Cancer Event at ASCO Chicago" (May 28, 2015), http://www.thestreet.com/story/13166632/1/puma-bio-restricting-access-to-breast-cancer-event-at-asco-chicago.html (last accessed April 10, 2016).

171.   TheStreet Report also noted the following about the importance of the ASCO annual meeting:

> Puma has said neratinib is a potential blockbuster drug for the treatment of HER2-positive breast cancer patients in the extended adjuvant setting. The data supporting this indication from the phase III "ExteNet" study are controversial, however, and will be subject to much debate at this year's ASCO annual meeting.

**The Truth Fully Emerges: June 1, 2015 – Full Data for ExteNET Revealed**

172.   On June 1, 2015, Dr. Arlene Chan presented the results of ExteNET at the ASCO annual meeting, expanding upon those results reported in Abstract #508.  The full results reiterated what Abstract #508 showed, that the absolute difference in DFS rates at two years was only 2.3%.

173.   The data presented by Dr. Chan revealed, for the first time, the Kaplan-Meier curves for ExteNET.  The curves were flat between the treatment arm and the placebo arm, with no trend of separation.  The vast majority of the separation came within the first year, showing an absolute DFS difference of 2.2% after one year and only a 0.1% difference thereafter.  Moreover, the curves began to narrow after year two.

174.   The data made clear that the Company's and Defendant Auerbach's statements of material fact regarding the success of neratinib in ExteNET were false and/or misleading.  For example, Defendant Auerbach's claims that "the [Kaplan-Meier] curves are continuing to separate," "the absolute DFS difference is increasing year over year," and "the results of [ExteNET] demonstrated that treatment with neratinib resulted in a 33% reduction of risk of invasive disease recurrence or death versus placebo" were all shown to be false and misleading at all relevant times.

175.   Dr. Chan presented the following slide, showing the primary endpoint results in ExteNET:



Presented By Arlene Chan at 2015 ASCO Annual Meeting

176.   Dr. Chan's presentation also disclosed that 39.9% of ExteNET patients that were treated with neratinib experienced grade 3 or 4 diarrhea and that 16.8% of patients taking neratinib discontinued treatment as a result of experiencing the grade 3 or higher diarrhea.  Thus, the percentage of patients taking neratinib in the ExteNET trial who discontinued treatment and/or dropped out of the trial was far greater than the 5% to 10% range that Defendant Auerbach had previously claimed.

177.   On June 1, 2015, the Company filed a Form 8-K with the SEC, signed by Defendant Auerbach, which attached a press release issued earlier that day (the "6/1/15 Press Release").  The 6/1/15 Press Release was titled, "Puma Biotechnology Announces Phase III Trial of PB272 in Extended Adjuvant Breast Cancer (ExteNET Trial) Demonstrates Statistically Significant Improvement in Disease Free Survival."

178.   Discussing the data from ExteNET, the 6/1/15 Press Release disclosed that "39.9% of the neratinib-treated patients experienc[ed] grade 3 or higher diarrhea."

179.   Notably, in the 6/1/15 Press Release, the Company stepped back from its repeated representations of a "33% improvement in disease-free survival."  Instead, in

a misleading attempt to cover its tracks while looking consistent, the Company made the following representation:

> The primary endpoint of the trial was invasive disease free survival (DFS). The results of the trial demonstrated that treatment with neratinib resulted in a 33% **reduction of risk of invasive disease recurrence or death versus placebo** (hazard ratio = 0.67, p = 0.009). The 2-year DFS rate for the neratinib arm was 93.9% and the 2-year DFS rate for the placebo arm was 91.6%.

180.   The 6/1/15 Press Release also quoted Defendant Auerbach in his words to investors: "We look forward to proceeding with the regulatory filing for neratinib for the extended adjuvant treatment of breast cancer currently anticipated in the first quarter of 2016."

181.   Despite these assurances regarding the NDA filing in 2016, the data were inconsistent with previous representations by the Company.  As pointed out by an article published by TheStreet on June 1, 2015, Dr. Harold Burstein, a breast cancer expert from the Dana-Farber Cancer Institute, stated that "[t]he benefit for breast cancer patients treated with Puma's neratinib was 'awfully small' for a drug that causes 'a lot of diarrhea.'"[13]

182.   A Cowen and Company pharmaceutical analyst, explained:
> Given prior comments from PBYI, investors had expectation (sic) of at least a 3% absolute benefit, and perhaps a benefit as high as 4-5%. In addition, some physicians are focused on absolute benefits as much as relative risk reductions. Given neratinib is associated with significant tolerability issues, some consultants have commented that they would like to see at least 3-4 women cured per 100 treated. Hence the 2.3% figure could lead to lower penetration in the marketplace.

---

[13] Adam Feuerstein, "Puma Bio Breast Cancer Drug Given Rough Treatment at ASCO '15" (June 1, 2015), http://www.thestreet.com/story/13170389/1/puma-bio-breast-cancer-drug-given-rough-treatment-at-asco-15.html (last accessed April 10, 2016).

183.   A later Cowen and Company analyst report explained why the truth about neratinib and ExteNET was negative, stating the following:

> Neither of our consultants were enthusiastic about the ExteNET dataset. They noted that the prognosis for HER2+ early stage patients is already very good with currently available therapies, therefore even though the hazard ratio targets were met, the absolute magnitude of difference in DFS was "trivial." Neratinib's use is likely to be limited to a small subset, most likely in ER/PR+ node positive disease.
>
> ***
>
> Both consultants believe that the market share for this drug is likely to be "very small" in the extended adjuvant setting because (1) patients do very well on existing therapies, (2) neratinib has significant tolerability issues, even with imodium prophylaxis, [and] (3) the vast majority [of patients] (~80%) are node negative, where the drug is likely to only show a modest benefit . . . .

184.   Other investors likewise reacted harshly to the ExteNET data, and on June 1, 2015, the price of Puma common stock plummeted $21.98 or 11.5% to close at $169.97.  The next day, June 2, 2015, the price of Puma's common stock continued falling and dropped an additional $23.32 or 13.7% to close at $146.65.  The over 23% two-day drop came on above average volume, between six and eight times the 90 day average.

**June 4, 2015 – Puma Common Stock Continues its Tumble**

185.   On June 4, 2015, an article was published by TheStreet titled "Top-Performing Biotech and Drug Stocks During ASCO '15" (the "6/4/15 TheStreet Report").[14]   The 6/4/15 TheStreet Report announced that "Puma Biotech (PBYI) was the worst-performing biotech and drug stock during the ASCO period, falling 28% due

---

[14] Adam Feuerstein, "Top-Performing Biotech and Drug Stocks During ASCO '15" (June 4, 2015), http://www.thestreet.com/story/13174675/1/top-performing-biotech-and-drug-stocks-during-asco-15.html (last accessed April 10, 2016).

to the underwhelming efficacy and high rate of side effects seen with the company's breast cancer drug neratinib."

186.   Over the next four trading days, June 4, 5, 8, and 9, 2015 the price of Puma common stock tumbled down $16.22 or 11% to close at $130.80 on June 9, 2015.

**June-November, 2015 – Puma Common Stock Continues its Descent**

187.   Over the following months, the price of Puma common stock continued to fall, the Individual Defendants continued their rampant mismanagement of the Company's affairs, and the misrepresentations continued.

188.   First, between June 9, 2015 and November 19, 2015, the price of Puma common stock dropped $63.45 or 48.5% to close at $67.35 on November 19, 2015.

189.   Second, the Individual Defendants continued needlessly spending badly needed Company assets while diluting shareholders' equity.  For instance, on June 9, 2015 the shareholders approved, on advice from the Board, a proposal by the Board (nearly 8 million shares voted against the proposal), to increase the number of shares of common stock the Company is authorized to issue its employees under the Company's 2011 Incentive Award Plan by 4,000,000 shares, from 6,529,412 shares to 10,529,412 shares.  This type of self-dealing continued on October 7-8, 2015, when the Company's Compensation Committee increased Defendants Auerbach's and Eyler's annual salaries by $63,000 and $39,492, respectively, effective September 1, 2015.  These actions were undertaken despite the fact that the Company's expenses were increasing and an expensive directorial position was added to the Board.

190.   Third, the Company persisted in its scheme to disseminate false and misleading material facts, even after shareholders were substantially damaged due to the same.  In the Company's quarterly reports for the quarter ended June 30, 2015, filed with the SEC on August 10, 2015 and signed by Defendants Auerbach and Eyler, and attaching SOX certifications signed by Defendants Auerbach and Eyler attesting to the accuracy of the quarterly report, the Company represented that it was "preparing for the filing of a NDA with the FDA during the first quarter of 2016."  In the next quarterly report for the quarter ended September 30, 2015 and filed with the SEC on November

9, 2015, the Company made a similar representation, but used slightly different language, stating that the Company was "preparing for the filing of an NDA, which we anticipate to occur in the first quarter of 2016."

**November 19, 2015 – Demand on the Board Rejected**

191.  On November 19, 2015, the Company filed a Form 8-K with the SEC, signed by Defendant Auerbach, which addressed an investor's efforts to reform the Company's management structure (the "11/19/15 8-K").

192.  The Company had earlier disclosed, through a November 2, 2015 Form 8-K, that Dr. Fredric N. Eshelman (referred to as "Holder" in the 11/19/15 8-K and "Dr. Eshelman" herein) was seeking the support of the Company's stockholders in an effort to ensure proper management and supervisory control over the Company.  Dr. Eshelman based his demands for corporate reforms on allegations of breach of fiduciary duty.

193.  As announced in the 11/19/15 8-K, Dr. Eshelman filed a Definitive Consent Statement with the SEC on November 18, 2019 (the "DCS").  The DCS contained four proposals, including a request to repeal any bylaw not in the Company's Bylaws as of September 14, 2007, remove any directorial appointment after September 9, 2015, increase the size of the Board from five to nine directors, and to elect Fredric N. Eshelman, James M. Daly, Seth A. Rudnick, and Kenneth B. Lee, Jr. to the Board.

194.  The Company reviewed Dr. Eshelman's demands and rejected each one of them outright, stating that "[t]he Board believes that Holder's efforts to increase the size of the Board and to appoint Holder's nominees to the Board is a disruptive and value destructive exercise . . . . **As such, the Board strongly recommends that stockholders reject Holder's Consent Solicitation . . . .**" (Emphasis in original).

195.  The 11/19/15 8-K announced that "[t]he Company plans to file a consent revocation statement with the SEC that will enable it to solicit the revocation of any consents stockholders may have already submitted in respect of Holder's proposals." The 11/19/15 8-K then listed several reasons that were considered by the Board "in reaching its conclusion to recommend that stockholders reject Holder's Consent Solicitation."  Among these reasons were the following: (1) the Company "anticipates

59

filing for regulatory approval of PB272 for the extended adjuvant treatment of HER2-positive breast cancer in the first quarter of 2016," (2) the Company believes that a five-member Board is "appropriate for effectively governing the Company," (3) the current Board is fit to guide the Company through the next stages of development, "which include the expected filing of an NDA for PB272 for the extended adjuvant treatment of HER2-positive breast cancer in the first quarter of 2016," and (4) Holder relies on "baseless allegations of breaches of fiduciary duty by the Board."

196.   The Company concluded the 11/19/15 8-K by reiterating the Board's rejection of all of Dr. Eshelman's recommended reforms and strongly urging shareholders to do the same.  Specifically, the 11/19/15 8-K read, "***Accordingly, the Company's Board of Directors urges stockholders of the Company to reject Dr. Fredric N. Eshelman's Consent Solicitation . . . . Stockholders who have already returned WHITE consent cards are urged to revoke their consent.***"  (Emphasis in original).

197.   On December 4, 2015, the Company filed a Proxy Statement on Schedule 14A with the SEC, attaching a December 4, 2015 slideshow that the Company presented to Institutional Shareholder Services Inc. (the "12/4/15 Presentation").

198.   The 12/4/15 Presentation reiterated the Company's representation that it would file the NDA in the first quarter of 2016.

199.   Importantly, the 12/4/15 Presentation also provided the Company's position on Dr. Eshelman's demand on the Board.  The 12/4/15 Presentation defended the Individual Defendants' experience, explained the Company's belief that the Board's size was "optimal," used the directors' large holdings of Company stock to defend their placement on the Board, attacked Dr. Eshelman's arguments regarding the false and misleading statements of material fact made by the Company, and dismissed Dr. Eshelman's proposals.   The following are exemplary slides from the 12/4/15 Presentation:

## Active, Engaged and Experienced Board

*Current Board members are active, engaged, experienced and extremely qualified*

- Current members collectively have over 60 years of experience serving as directors or officers of various public and private life sciences companies

- As officers, they have collectively filled various roles, including chief executive officer, chief financial officer, chief medical officer and vice president of clinical and regulatory affairs of various companies involved in the development of breast cancer products and products to enhance cancer care and treatment

- All Board members other than Alan H. Auerbach, the Company's President and Chief Executive Officer, are independent under the standards of the NYSE and the SEC

- The Board constantly evaluates the need for additional board members – two new independent directors (Frank Zavrl and Adrian M. Senderowicz) who have additional expertise in the field of biotechnology investments and clinical and regulatory affairs were appointed to the Board this year

## Board and Management Interests are Aligned with Those of Shareholders

### Puma Directors and Executive Officers Beneficial Ownership[1][2]

| Name | Number (#) | Percentage (%) |
|---|---|---|
| Alan H. Auerbach, *President, Chief Executive Officer and Chairman of the Board*[3] | 6,681,249 | 19.0% |
| Charles R. Eyler, *Senior Vice President, Finance and Administration and Treasurer*[4] | 148,373 | * |
| Steven Lo, *Chief Commercial Officer* | — | — |
| Richard P. Bryce, MBChB, MRCGP, MFPM, *Senior Vice President, Clinical Research and Development*[5] | 146,508 | * |
| Jay M. Moyes, *Director*[6] | 89,999 | * |
| Adrian M. Senderowicz, M.D., *Director* | — | — |
| Troy E. Wilson, *Director*[7] | 39,787 | * |
| Frank Zavrl, *Director*[8] | 913,076 | 2.8% |
| All executive officers and directors as a group (8 individuals) | 8,018,992 | 22.6% |

\* Denotes less than 1.0% of beneficial ownership

(1) This table is based upon information supplied by our officers and directors and transfer agent. Unless otherwise noted in the footnotes to this table, we believe each of the stockholders named in this table has sole voting and investment power with respect to the shares indicated as beneficially owned, subject to community property laws, where applicable. Applicable percentages are based on 32,455,748 shares of our common stock outstanding as of November 2, 2015, adjusted as required by the rules promulgated by the SEC.

(2) Beneficial ownership is determined in accordance with SEC rules, and includes any shares as to which the stockholder has sole or shared voting power or investment power, and also any shares which the stockholder has the right to acquire within 60 days of November 2, 2015, whether through the exercise or conversion of any stock option, convertible security, warrant or other right. The indication herein that shares are beneficially owned is not an admission on the part of the stockholder that he, she or it is a direct or indirect beneficial owner of those shares.

(3) Consists of (i) 4,040,000 shares held by Mr. Auerbach, (ii) 2,116,250 shares exercisable pursuant to an anti-dilutive warrant held by Mr. Auerbach, and (iii) options to purchase 525,000 shares of our common stock exercisable within 60 days of November 2, 2015

(4) Consists solely of options to purchase 148,373 shares of our common stock exercisable within 60 days of November 2, 2015

(5) Consists of 30 shares held by Dr. Bryce and options to purchase 146,478 shares of our common stock exercisable within 60 days of November 2, 2015

(6) Consists solely of options to purchase 89,999 shares of our common stock exercisable within 60 days of November 2, 2015

(7) Consists of 100 shares held in an IRA by Dr. Wilson, 400 shares and 150 shares held in minor accounts for Dr. Wilson's children and options to purchase 38,687 shares of our common stock exercisable within 60 days of November 2, 2015

Verified Shareholder Derivative Complaint

## Eshelman's Claims are Misleading and Unfounded

*Eshelman spins out unfounded misleading statements about Puma*

- Falsely accuses Puma of refusing to comply with its legal obligations to comply with Eshelman's 220 Demand
  - Puma takes seriously its obligations to its shareholders to guard confidential information and not to disclose it to anyone trolling for material non-public information
  - Eshelman prematurely, and notwithstanding assurances received from the Company, filed suit to enforce a 220 Demand for stockholder information to which the Company was already responding

*Eshelman makes his own unfounded misleading statements*

- Misleads shareholders by speculating on M&A activity
  - No basis for the speculation other than citing unsupported analyst reports that Puma could be an acquisition target (the same is true for virtually all biotechnology companies)

- Misleads shareholders by assuming as fact the allegations in currently pending shareholder litigation
  - Company recently filed a motion to dismiss the shareholder litigation which refutes Eshelman's characterization of the statements he quotes and demonstrates their truthfulness

- Fails to understand ExteNET trial results – conflates two different metrics: improvement in hazard ratio and absolute disease-free survival

## Eshelman's Proposal Weakens the Board Without Additional Benefit

*Eshelman's proposal actually weakens the Board*

- Eshelman's nominees do not possess any attributes, ability or experience that that would be unique or additive to the Board's current composition or have more compelling experience than that of Puma's current Board

- Eshelman and his nominees appear to have no actual experience developing drugs to treat cancer (other than serving on the boards of oncology drug companies that had already commercialized products or failed to develop products)

- Eshelman and one of his nominees, Seth A. Rudnick, currently claim to serve on eleven (11) and seven (7) boards of directors, respectively, and so it is difficult to imagine that they will be able to dedicate significant time or make a valuable contribution to Puma

- The addition of four (4) new directors to the Board would create inefficiencies and impose unnecessary costs

- Other than Eshelman (who beneficially owns less than 1.0% of Puma common stock), no Eshelman nominee holds any shares of Puma common stock

- Provides a < 1.0% shareholder and his hand-picked nominees with greater than 40% of board influence

200. Thus, the Board rejected many of the demands (i.e. corporate reforms) Plaintiff moves for in this action. Moreover, the Company represented to investors that

it would file an NDA for regulatory approval of neratinib in the United States in the first quarter of 2016.  Using this misrepresentation it attempted to convince investors to reject an ongoing effort to reform the Company's inadequate controls and management.

201.   Communications between the Individual Defendants and Dr. Eshelman is ongoing, but deteriorating into a frenzy of insults and allegations of fraud.  On January 20, 2016, Dr. Eshelman demanded an apology from Defendant Auerbach for slanderous comments he made to investors about Dr. Eshelman.

**February 29, 2016 – 2015 Annual Report**

202.   On February 29, 2016, the Company filed an annual report for the fiscal year ended December 31, 2015 on a Form 10-K with the SEC ("2015 10-K"), which was signed by the entire Board that exists at the time of filing of this Complaint and Defendant Eyler.

203.   Attached to the 2015 10-K were SOX certifications signed by Defendants Auerbach and Eyler attesting to the accuracy of the 2015 10-K.  Specifically, the SOX certifications certified that the 2015 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

204.   The 2015 10-K contained the misleading amended language relating to the results of ExteNET, which the Company began using after its previous false and misleading misrepresentations about the same were detected.   Specifically, the Company represented the following:

> The primary endpoint of the trial was ***invasive disease free survival*** (DFS). The results of the trial demonstrated that treatment with neratinib resulted in a 33% reduction of risk of ***invasive disease recurrence*** or death versus placebo (hazard ratio = 0.67, p = 0.009). The 2-year DFS rate for the neratinib arm was 93.9% and the 2-year DFS rate for the placebo arm was 91.6%.

205.   The Company also continued to represent that it anticipated filing the NDA with the FDA in the first quarter of 2016.  Specifically, the Company represented, in its

2015 10-K, that it incurred additional expenses for the fiscal year "in preparation of filing an NDA with the FDA, which we anticipate will occur in the first quarter of 2016."

206.   Indeed, in a press release issued the same day, February 29, 2016, the Company explained, "We anticipate . . . submitting a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) during the first quarter of 2016."

**March 29, 2016 – Submission of NDA for Approval of Neratinib Pushed Back**

207.   One day before the end of the first quarter of 2016 and less than a month after representing that it anticipated filing an NDA for neratinib in the first quarter of 2016, the Company admitted that it was not prepared to do what it assured the public it was prepared to do.   On March 28, 2016, the Company announced that based on its recent meetings with the FDA, the Company now planned to submit its NDA for the approval of neratinib in mid-2016.

208.   On this news, the price of Puma common stock dropped $7.45 or 21% to close at $27.92 on March 29, 2016.   The huge drop came on a record-setting volume of over 4.1 million shares trading hands.

**Defendant Auerbach Attempts to Sell the Company**

209.   Defendant Auerbach breached his fiduciary duties by actively seeking to have the Company acquired by a larger pharmaceutical company after Puma's stock price was artificially inflated due to the false and misleading statements discussed herein.   Per Defendant Auerbach's and Eyler's agreements with the Company, the sale of Puma would trigger a change of control provision contained therein.   Pursuant to the provision, upon a change of control Defendant Auerbach's and Eyler's stock options would immediately vest and all of their shares, which totaled over 6 million and 120,000, respectively, before the truth fully emerged, could be cashed in at the acquisition price.   Moreover, a change of control would permit Defendant Auerbach to exercise a warrant to acquire an additional 2,116,250 shares of Company common stock at $16.00 per share and also cash those in at the acquisition price.

**Defendants' Wrongful Conduct**

210.  In breach of their fiduciary duties owed to Puma, the Individual Defendants willfully or recklessly made and/or caused the Company to make *at least* the following false and/or misleading statements of material fact: (1) ExteNET trial data showed an absolute difference in disease-free survival rates between neratinib and placebo of approximately 5%, (2) the data from the ExteNET trial demonstrated a 33% improvement in disease-free survival, (3) the data from the ExteNET trial showed that the Kaplan-Meier curves were separating or widening, (4) the results from the ExteNET trial were "in line" with the Herceptin Adjuvent Studies, (5) the Company anticipated filing a New Drug Application ("NDA") for neratinib in the first half of 2015, (6) that approximately 29% to 30% of patients treated with neratinib suffered grade 3 or 4 diarrhea, and that the dropout rate due to adverse events would be 5% to 10%, and (7) the Company anticipated filing an NDA for neratinib in the first quarter of 2016.  These facts pertained to the Company's business, operations, and prospects and were known to the Individual Defendants or recklessly disregarded by them.  The Company's statements and representations, referenced above were materially false and misleading at all relevant times.  Moreover, the Individual Defendants failed to adequately correct those false and misleading statements and/or omissions of material fact.

211.  In breach of their fiduciary duties owed to Puma, the Individual Defendants willfully or recklessly made and/or caused the Company to omit material facts, including (1) the truth surrounding each of the Company's aforementioned false and misleading statements of material fact, and (2) the Individual Defendants' intentional and/or reckless participation, either directly or indirectly, in the dissemination of the false and misleading statements for the purpose of artificially inflating the Company's stock so as to equip the Company with sufficient assets to maintain their salaries, bonuses, and fees.

212.  In breach of their fiduciary duties owed to Puma, the Individual Defendants willfully or recklessly caused the Company to sell $330 million of Company

stock at artificially inflated prices while causing the Company to increase their salaries, bonuses, fees, and Company stock holdings.

213.   The Individual Defendants also breached their fiduciary duties by failing to maintain internal controls.

214.   Moreover, Defendant Auerbach breached his fiduciary duties to Puma by actively seeking to have the Company acquired by a larger pharmaceutical company after Puma's stock price was artificially inflated due to the false and misleading statements.

## **DAMAGES TO PUMA**

215.   As a direct and proximate result of the Individual Defendants' conduct, Puma will lose and expend many millions of dollars.

216.   Such expenditures include, but are not limited to, legal fees associated with the Securities Fraud Class Action filed against the Company and Defendants Auerbach and Eyler, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

217.   Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

218.   Such costs include, but are not limited to, compensation, bonuses tied to the Company's attainment of certain goals, which the Company misrepresented that it met, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

219.   As a direct and proximate result of the Individual Defendants' conduct, Puma has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE ALLEGATIONS**

220.   Plaintiff brings this action derivatively and for the benefit of Puma to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Puma, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

221.   Puma is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

222.   Plaintiff is, and at all relevant times has been, a shareholder of Puma. Plaintiff will adequately and fairly represent the interests of Puma in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

223.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

224.   A pre-suit demand on the Board of Puma is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Individual Defendants Auerbach, Moyes, Wilson, Zavrl, and Senderowicz (collectively, the "Director-Defendants"), and non-party Michael P. Miller (together with the Director-Defendants, the "Directors").  Plaintiff needs only to allege demand futility as to three of the six Directors that were on the Board at the time this action was commenced.

225.   Foremost, demand is excused as to all of the Director-Defendants because each one of them served on the Board when Dr. Eshelman made his demand for corporate reforms through the DCS, which included much of the relief sought herein. Instead of heeding Dr. Eshelman's venerable requests, the Board commenced a campaign of rejection, dismissal, and personal attacks.  The 11/19/15 8-K and the 12/4/15 Presentation represent two of the many communications through which the Board expressed its complete rejection of the need for corporate reform and the

67

Individual Defendants' liability related to the Company's misrepresentations as described herein.  Indeed, as described herein, the Board has expressly rejected expanding the size of the Board, changing managerial or directorial staff, and making certain amendments to Puma's Bylaws.  Moreover, the Board has refused to initiate an investigation into the alleged misconduct outlined in the DCS, and much of which is alleged herein, and instead deemed such allegations "baseless allegations of breaches of fiduciary duty."  In rejecting Dr. Eshelman's demands and failing to investigate the Individual Defendants' breaches of fiduciary duty, the Board spent, and is spending, considerable effort and Company resources to convince shareholders to also reject Dr. Eshelman's demand.  As part of its efforts, the Board created and presented detailed presentations to shareholders, issued several proxy statements on the issue, and sent letters to Dr. Eshelman and shareholders voicing its unshakeable position of purported innocence.  Thus, demand has already been made on the Board, and rejected.  But even if this Court finds that demand has not been made on the Board, based on the Board's conduct in responding to Dr. Eshelman, such demand is futile and therefore, excused.

226.   Moreover, demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and the false and misleading statements and omissions of material facts described herein, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

227.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

228.   Furthermore, demand in this case is excused because the Director-Defendants, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendant Auerbach, who is the Company's CEO-Chairman, and who is most responsible for causing the Company's misconduct and for making the false and misleading statements of material fact alleged herein and for failing to adequately correct those false and misleading statements.  Thus, each member of the Board is not disinterested or independent, faces a substantial likelihood of liability, and, thus, demand on each Director would have been futile, and is thus excused.

229.   The Director-Defendants other than Defendant Auerbach hold at least one position on a specific board committee.  As stated in the 2015 Proxy Statement, the board committees have the following responsibilities:

**Audit Committee**

Our Audit Committee provides oversight over each of our accounting and financial reporting process, the audit of our consolidated financial statements and our internal control function. Among other matters, the Audit Committee assists our Board in oversight of the independent registered public accounting firm qualifications, independence and performance; is responsible for the engagement, retention and compensation of the independent auditors; reviews the scope of the annual audit; reviews and discusses with management and the independent registered public accounting firm the results of the annual audit and the review of our quarterly consolidated financial statements, including the disclosures in our annual and quarterly reports filed with the SEC; reviews our risk assessment and risk management processes; establishes procedures for receiving, retaining and investigating complaints received by us regarding accounting, internal accounting controls or audit matters; approves audit and permissible non-audit services provided by our independent registered public accounting firm; and reviews and approves related person transactions under Item 404 of Regulation S-K.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Compensation Committee**

Our Compensation Committee adopts and administers the compensation policies, plans and benefit programs for our executive officers and all other members of our executive team. In addition, among other things, our Compensation Committee annually evaluates, in consultation with our Chief Executive Officer, the performance and compensation of our Chief Executive Officer and our other executive officers. Based on such evaluation, the Compensation Committee determines and approves all of the compensation of the Chief Executive Officer and other executive officers. The Chief Executive Officer is not permitted to be present during any Compensation Committee final deliberations or voting concerning the compensation of any executive officer, including the Chief Executive Officer. Our Compensation Committee also administers the Puma Biotechnology, Inc. 2011 Incentive Award Plan (the "Plan"). Additionally, the Compensation Committee annually reviews the compensation and benefits of our non-management directors. The Compensation Committee has delegated certain of its authority under the Plan to the Stock Option Committee. See "Stock Option Committee."

**Nominating and Corporate Governance Committee**

Our Nominating and Corporate Governance Committee is responsible for, among other things, making recommendations regarding corporate governance, the composition of our Board, identification, evaluation and nomination of director candidates and the structure and composition of committees of our Board. In addition, our Nominating and Corporate Governance Committee oversees our corporate governance guidelines, makes recommendations regarding our committee charters, oversees compliance with our code of business conduct and ethics, contributes to succession planning, reviews actual and potential conflicts of interest of our directors and officers other than related person transactions reviewed by the Audit Committee and oversees the self-evaluation process of our

Board. Our Nominating and Corporate Governance Committee also is responsible for making recommendations regarding non-employee director compensation to the full Board.

**Stock Option Committee**

The Board delegated to the Stock Option Committee the authority to grant stock options to non-executive employees, subject to the following conditions:

☐ the maximum aggregate number of shares of common stock underlying options granted pursuant to this authority is 100,000 per individual, subject to adjustment by the Board; and

☐ the stock options must have an exercise price equal to the closing price of our common stock on the grant date and have a term not longer than ten years.

230.   Additional reasons that demand on Defendant Auerbach is futile follow. Defendant Auerbach is the Company's Chairman and Chief Executive Officer, and is thus, as the Company admits, a non-independent director.  Defendant Auerbach was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, almost all of which he attested to the accuracy of, and including many of which he personally made.  His large Company stock holding, worth ***$1.4 billion*** on the day the fraud began to be exposed, and which represented 18.9% of the Company's issued and outstanding common stock, reveals his interest in keeping the Company's stock price as high as possible.  Defendant Auerbach received increases in salary and additional grants of stock while the Company was collecting money from artificially inflated stock, to the detriment of the shareholders and the Company.  Moreover, Defendant Auerbach is a defendant in the Securities Fraud Class Action.  Finally, Defendant Auerbach conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes to make false and misleading statements and/or omissions of material fact and waste corporate assets,

consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, Defendant Auerbach breached his fiduciary duties by attempting to sell the Company while the price of the Company's stock was artificially inflated due to the false and misleading statements.  For these reasons, too, Defendant Auerbach breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

231.   Additional reasons that demand on Defendant Moyes is futile follow.  His large Company stock holding, worth $16.6 million on the day the fraud began to be exposed, reveals his interest in keeping the Company's stock price as high as possible. As Chairman of the Compensation Committee, a member of the Audit Committee and Nominating and Corporate Governance Committee, and a director, Defendant Moyes was responsible for the wasteful and unjust, lavish compensation of the Individual Defendants, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes to make false and misleading statements and/or omissions of material fact and waste corporate assets, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  For these reasons, too, Defendant Moyes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

232.   Additional reasons that demand on Defendant Wilson is futile follow.  His large Company stock holding, worth over $5.6 million on the day the fraud began to be exposed, reveals his interest in keeping the Company's stock price as high as possible. As a member of the Audit Committee and a director, Defendant Wilson conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes to make false and misleading statements and/or omissions of material fact and waste corporate assets,

consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Wilson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

233. Additional reasons that demand on Defendant Zavrl is futile follow. His large Company stock holding, worth $83.2 million and which represented 2.8% of the Company's issued and outstanding common stock, reveals his interest in keeping the Company's stock price as high as possible. As a member of the Audit Committee and a director, Defendant Zavrl conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes to make false and misleading statements and/or omissions of material fact and waste corporate assets, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Zavrl breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

234. Additional reasons that demand on Defendant Senderowicz is futile follow. His large Company stock holding, worth almost $2.7 million, reveals his interest in keeping the Company's stock price as high as possible. As a member of the Compensation Committee and a director, Defendant Senderowicz conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes to make false and misleading statements and/or omissions of material fact and waste corporate assets, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Senderowicz breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

235.   The Director-Defendants, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation.  The Director-Defendants did not comply with the requirements of the Code of Ethics.  The Director-Defendants violated the Code of Ethics because they participated in or were recklessly unaware of the materially false and misleading statements contained in the Company's public filings and communications, and in failing to maintain proper internal control and regulatory compliance.  Because the Director-Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

236.   The Director-Defendants, as members of the Board, were and are subject to the Corporate Guidelines.  The Corporate Guidelines goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Corporate Guidelines requires the Board to provide effective governance over the Company's affairs for the benefit of stockholders, to ensure that management is capably executing its responsibilities, to use their free access to management to obtain all information necessary to fulfill their duties, and to evaluate the CEO-Chairman.  The Director-Defendants did not comply with the requirements of the Corporate Guidelines.  The Director-Defendants violated the Corporate Guidelines because they participated in or were recklessly unaware of the materially false and misleading statements and/or omissions contained in the Company's public filings and communications, and in failing to maintain proper internal control and regulatory compliance.  Because the Director-Defendants violated the Corporate Guidelines, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

237.   The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.   These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.   Thus, any demand on the Directors would be futile.

238.   Each of the Director-Defendants is liable for wasting corporate assets and engaging in self-dealing because, while the Company had zero revenue, was low on assets, and had a dwindling common stock price, each put forward, and recommended adoption of, Board proposals to (1) to increase the number of shares of common stock the Company is authorized to issue its employees under the Company's 2011 Incentive Award Plan by 4,000,000 shares and (2) increase Defendants Auerbach's and Eyler's annual salaries by $63,000 and $39,492, respectively.   Thus, each of the Director-Defendants face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

239.   Moreover, the Director-Defendants have further shown they are incapable of properly considering a demand through their improper rejection of a litigation demand made by a Company shareholder on August 29, 2017 based on the same underlying facts that form the basis of this action (the "Litigation Demand").[15]   The Litigation Demand outlined improper statements that the Court in the Securities Fraud Class Action found sufficient to deny a motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act and Federal Rule of Civil Procedure 9(b), and that are also alleged to have been made in this action.

_____

[15] After his litigation demand was refused, the shareholder, Arnaud Van Der Gracht De Rommerswael, filed a derivative action in the United States District Court for the Central District of California, captioned *Van Der Gracht De Rommerswael v. Auerbach, et al.*, Case No. 8:18-cv-00236.   The information discussed in this section regarding the making of, contents of, and refusal of the Litigation Demand is drawn from the complaint filed in Van Der Gracht De Rommerswael's action on February 9, 2018.

240.   The Director-Defendants rejected the Litigation Demand in bad faith and did not perform an independent investigation in arriving at this decision.  Counsel for the Company and Defendants Auerbach and Eyler,[16] the defendants in the Securities Fraud Class Action, in a January 9, 2018 letter refusing the Litigation Demand (the "Refusal"), revealed that the Director-Defendants primarily based their decision on a biased investigation previously conducted by, and on related materials previously compiled by, Latham & Watkins for the purpose of developing a defense in the Securities Fraud Class Action.  Such an obvious conflict of interest resulted in the Director-Defendants performing a bad faith, non-independent investigation of the claims presented in the Litigation Demand, and thus also the claims alleged in this action.

241.   The Refusal also revealed that the Director-Defendants "unanimously concluded that pursuing the [Litigation] Demand would not be in Puma's or its shareholders' best interests."  The Refusal specifically stated, in relevant part:

> As a result of the pending shareholder class action, the Company, through its outside counsel, Latham & Watkins LLP, has already undertaken an extensive investigation regarding the issues and allegations presented in the [Litigation] Demand….
>
> Given the similarity between the class action allegations and your Demand, and in light of the extensive investigation that Puma's outside counsel has already undertaken, the Board requested that Latham & Watkins provide the Board with a detailed summary of the investigation and formal discovery efforts completed thus far, along with the key issues and findings resulting from that investigation. The Board also requested that [Latham & Watkins] provide the Board key documents and deposition testimony regarding the issues raised in the Demand. The Board carefully considered this detailed summary, along with the collection of key documents and deposition testimony in evaluating the merits of the Demand.

---

[16] Latham & Watkins LLP ("Latham & Watkins") serves as counsel for the Company and Defendants Auerbach and Eyler.

1

2
3
4

> Following a review of these materials, and a comprehensive presentation by [Latham & Watkins], the independent members of the Board concluded that it was not necessary to retain independent counsel to investigate the Demand.

5
6
7
8
9

> The independent board members also concluded, based on the evidence collected and reviewed, that the Demand lacks merit and that pursuing any of the matters requested in the Demand would waste corporate resources and distract from the Company's mission. The independent members of the Board have therefore unanimously concluded that pursuing the Demand would not be in Puma's or its shareholders' best interests.

10   242.   The Director-Defendants' rejection of the Litigation Demand was reliant

11  on a biased investigation by Latham & Watkins which was conducted previously to

12  establish a defense against the Securities Fraud Class Action, and thus did not consist

13  of a neutral analysis of the claims presented therein or of the facts discovered during

14  such investigation—such claims and facts that are material to this present action.

15  Instead, Latham & Watkin's investigation was conducted to gather evidence that would

16  exculpate the Securities Fraud Class Action defendants.   The Litigation Demand

17  specifically requested that "independent and disinterested directors with the assistance

18  of independent outside legal counsel" investigate the misconduct alleged therein.  The

19  Director-Defendants failed to investigate the wrongdoing alleged herein properly and

20  in good faith by relying instead on a biased investigation performed by non-independent

21  legal counsel rather than conducting an independent investigation.

22   243.   While Latham & Watkins was advising and reporting to the Director-

23  Defendants on issues related to the Litigation Demand, the Director-Defendants were

24  aware that Latham & Watkins was concurrently representing the defendants in the

25  Securities Fraud Class Action.   The Director-Defendants have shown that they are

26  incapable or at least unwilling to utilize an independent process to properly consider a

27  demand, as made clear through their decision to use as legal counsel the same law firm

28  that is representing the Securities Fraud Class Action defendants.   The Director-

Verified Shareholder Derivative Complaint

Defendants' rejection of the Litigation Demand was not within the scope of the business judgment rule. The Director-Defendants' wrongful rejection of the Litigation Demand thus confirms that demand on the Directors would be futile.

244. Puma has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Puma any part of the damages Puma suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

245. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

246. The acts complained of herein constitute violations of fiduciary duties owed by Puma's officers and directors, and these acts are incapable of ratification.

247. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Puma. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Puma, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is

brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

248.   If there is no directors' and officers' liability insurance, then the Directors will not cause Puma to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

249.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least three of the Directors, cannot consider a demand with disinterestedness and independence.   Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

250.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Puma's business and affairs.

252.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

253.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Puma.

254.   In breach of their fiduciary duties owed to Puma, the Individual Defendants willfully or recklessly caused the Company to issue false and misleading statements and/or omissions of material fact and to sell hundreds of millions of dollars worth of Company stock at artificially inflated prices for the purpose of increasing the

Individual Defendants' salaries and stock grants, to the detriment of the shareholders and the Company.  Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.

255.   The Individual Defendants also breached their fiduciary duties by failing to maintain internal controls.

256.   Moreover, Defendant Auerbach breached his fiduciary duties to Puma by actively seeking to have the Company acquired by a larger pharmaceutical company after Puma's stock price was artificially inflated due to the false and misleading statements.

257.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Puma's securities.

258.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Puma's securities.

259.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

260.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Puma has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

261.   Plaintiff on behalf of Puma has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

262.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

263.   By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Puma.

264.   The Individual Defendants either benefitted financially from the improper conduct, and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Puma that was tied to the performance or artificially inflated valuation of Puma, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

265.   Plaintiff, as a shareholder and a representative of Puma, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

266.   Plaintiff on behalf of Puma has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

267.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Puma, for which they are legally responsible.

269.   As a direct and proximate result of the Individual Defendants' abuse of control, Puma has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Puma has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

270.   Plaintiff on behalf of Puma has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

271.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

272.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Puma in a manner consistent with the operations of a publicly-held corporation.

273.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Puma has sustained and will continue to sustain significant damages.

274.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

275.   Plaintiff, on behalf of Puma, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

276.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

277.   The Individual Defendants caused the Company to sell hundreds of millions of dollars worth of Company stock at artificially inflated prices for the purpose of increasing their salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

278.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Puma to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

279.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

280.   Plaintiff on behalf of Puma has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Puma, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Puma;

(c)   Determining and awarding to Puma the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Puma and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Puma and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure

proper corporate governance policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.     a provision to permit the shareholders of Puma to nominate at least three candidates for election to the board; and

3.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)        Awarding Puma restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: May 30, 2018                      Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         */s/ Laurence M. Rosen*
                                         Laurence M. Rosen (SBN 219683)
                                         355 South Grand Avenue, Suite 2450
                                         Los Angeles, CA  90071
                                         Telephone: (213) 785-2610
                                         Facsimile: (213) 226-4684
                                         Email: lrosen@rosenlegal.com

                                         *Liaison Counsel for Plaintiff*

                                         **THE BROWN LAW FIRM, P.C.**
                                         Timothy W. Brown
                                         240 Townsend Square

84

1

2

Oyster Bay, NY 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

3

4

*Counsel for Plaintiff*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>VERIFICATION</u>

I, Paul Duran  am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this  th day of May, 2018.

5/30/2018  6:03:48 AM  PDT

Paul Duran